319 P.3d 1131

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Melchor B. ADVIENTO, Petitioner/Defendant–Appellant.**

**No. SCWC–30171.**

Supreme Court of Hawai'i.

Feb. 10, 2014.

Summer M.M. Kupau, for petitioner.

Donn Fudo, Honolulu, for respondent.

McKENNA, and POLLACK, JJ., with ACOBA, J., Concurring, with NAKAYAMA, J., Dissenting, with whom RECKTENWALD, C.J. Joins.

Opinion of the Court by POLLACK, J.

Petitioner/Defendant–Appellant Melchor B. Adviento (Adviento) seeks review of the August 16, 2012 Judgment on Appeal of the Intermediate Court of Appeals (ICA),[1] filed

1. The Honorable Craig H. Nakamura, Chief Judge, the Honorable Katherine G. Leonard, and the Honorable Lisa M. Ginoza, presiding.

pursuant to its July 10, 2012 Memorandum Opinion, affirming the Judgment of Conviction and Sentence (Judgment) entered by the Circuit Court of the First Circuit (circuit court)[2] on October 21, 2009.

This appeal requires us to consider a trial court's duty to instruct the jury on the affirmative, mitigating defense of "extreme mental or emotional disturbance" (EMED) under Hawai'i Revised Statutes (HRS) § 707–702(2), in situations where neither party requests the instruction. For the reasons set forth herein, we hold that the trial court has a duty to instruct the jury on the EMED defense when it is raised by the evidence. Thus a defendant may not waive an instruction on the EMED defense. Accordingly, we vacate the ICA's Judgment on Appeal and the circuit court's Judgment, and remand the case for a new trial consistent with this opinion.

## I.

On November 6, 2007, Adviento was indicted upon a charge of murder in the second degree in violation of HRS §§ 707–701.5[3] and 706–656.[4] The State alleged that on or about October 28, 2007, Adviento intentionally or knowingly caused the death of his wife, Erlinda Adviento (Erlinda).

## A.

On June 30, 2009, the State filed a "Notice of Intent to Use Evidence" (Notice), declaring its intent to "use as evidence" a March 2004 incident in which Adviento hit Erlinda with a phone, "causing physical injuries to [Erlinda]" and resulting in the police being called. The incident had occurred when Erlinda and Adviento began arguing over their children's homework.

The defense objected to the admissibility of the phone incident on the basis that the evidence was more prejudicial than probative under Hawai'i Rules of Evidence (HRE) Rule 403, and that there was a lack of foundation for the evidence because Adviento and Erlinda's youngest son who had witnessed the incident "did not really remember the incident and does not know particular details." The defense also objected that Erlinda's "statements to the police and others during the case five years ago following her being hit with a phone" constituted hearsay statements, and that their admission would violate Adviento's constitutional right to confront witnesses.

## B.

Adviento's jury trial began on July 6, 2009 with jury selection.

On July 7, 2009, after the jury had been selected, the jury was excused and the court stated that it was ready to rule on the admissibility of the 2004 phone incident. As an initial matter, the court noted, and the parties agreed, that as a result of the incident, Adviento had been convicted of assault in the third degree approximately three and a half years prior to Erlinda's death. The court then stated that it would withhold ruling on the admissibility of the conviction until the court knew whether Adviento would assert an EMED defense, and the nature of such a defense. The court further held that if the conviction was admitted into evidence, then it would be admitted on rebuttal, and it would be "[j]ust the conviction" and not the "specific facts" of the underlying act:

> THE COURT: ... my preference would be to allow in the conviction; because we don't have to fight about what really happened. There was a conviction. And this is why I'm withholding ruling on it. Because I'm not sure how you're going to raise the EMED defense. I can't, at this point, get it clear in my mind how it's

---

2. The Honorable Richard K. Perkins presiding.

3. HRS § 707–701.5 (1993) provides:
   Murder in the second degree. (1) Except as provided in section 707–701 [pertaining to murder in the first degree], a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

4. HRS § 706–656 (1993 & Supp.2007) establishes the terms of imprisonment for first and second degree murder and attempted first and second degree murder.

going to come up. I mean, if it depends on the relationship, then *Maelega* and cases like *Hiley* (phonetic) say it comes in.

Right?

If his defense arises from the nature of their relationship, it may have to come in. If it doesn't, then it won't. I think that— I'm not convinced that—let's put it that way. I'm not convinced that it would come in for anything other than rebuttal of the EMED defense. We're talking about that conviction, the hitting on the head with the phone.

[DEFENSE COUNSEL]: I just need to be clear....

If we're talking about that, is it just going to be the conviction? Or is it going to be the facts underlying the conviction, as well?

THE COURT: Just the conviction.

[DEFENSE COUNSEL]: Just the conviction. Okay.

. . . .

THE COURT: As far as the strength of the evidence goes, the conviction is the strongest evidence. And if you are—if you are trying to establish in rebuttal of the EMED defense that this marriage was not without its problems and there was some violence in the past, to me the conviction is your evidence, if the Defense raises that defense. And, so, what I'm saying is, if that comes in, it will come in on rebuttal, the conviction. And let's—let me rule now, that if it comes in, it will just be the conviction of Assault in the Third Degree, assault against the decedent and not the specific facts. Let's just wait on that.

(Emphases added).

The court reiterated to the prosecutor that he was not permitted to reference the assault conviction in his opening statement "[b]e- cause, again, I'm not sure how the EMED defense will arise. I don't know what he's going to say." The court continued and stat- ed again that it would wait to "hear exactly how EMED comes up."

At the next trial date on July 9, 2009, prior to opening statements, defense counsel in- formed the court that the defense would not be asserting the EMED defense because of the court's "pretrial rulings":

[DEFENSE COUNSEL]: Judge, we wanted to put a couple things on the rec- ord. I think the Prosecutor wanted you to have an on-the-record colloquy with the defendant as to stipulations and things of that nature; and I want to put on the record yesterday I met with Mr. Adviento, we discussed the Court's pretrial rulings, defenses and the type of evidence and things of that nature, and based on his decision, we are not going to be asserting the extreme emotional defense, extreme emotional disturbance defense, and this is his decision that he made yesterday, so I just wanted to put that on the record.

(Emphases added).

The court responded, "Okay." The court then questioned the prosecutor about an ad- ditional witness that the State had just named. The prosecutor explained that the witness was "the fingerprint examiner who examined the fingerprints from [Adviento's] assault conviction," and that the State intend- ed to use the witness' testimony "as an offer of proof" to rebut any EMED defense raised during the defense's case. The prosecutor explained, "I thought in light of how the Judge rules on the motion in limine, that might be the useful or safer way, just to be able to present the assault conviction without putting on, say, a probation officer or arrest- ing officer." The court responded, "If EMED is not raised, it's unlikely that the Court's going to allow that."

The prosecutor then commented that it was his understanding that it was not up to the defendant to assert the EMED defense if the evidence raised it. Defense counsel re- sponded that it was the defendant's choice to raise the EMED defense or not because EMED is an affirmative defense:

[PROSECUTOR]: Correct, and my only comment to what [defense counsel] just stated [regarding the defendant not assert- ing the EMED defense] is I'd like to hear that from the defendant's mouth on the record, if he decides that is how he wants to proceed, just to avoid something down the road. And then I also, just as a com- ment, I don't know if he can make that

decision if the evidence comes out, however—in other words, I think it's the evidence that decides.

THE COURT: What are you going to do—ask for an EMED instruction?

[DEFENSE COUNSEL]: No. As an affirmative defense, I think it is his choice, Judge. It's not a regular defense, so that's why I left it up to him.

(Emphases added).

The court responded, "We'll go ahead with the opening statements and the preliminary instructions, and then I'll voir dire him on all of the stipulations and the EMED thing. We should get started."

### C.

The following facts are taken from the evidence adduced during the three days of testimony by the State and defense witnesses.

### 1.

Adviento and Erlinda met in the Philippines and were married for nearly twenty-four years. They had three children together: a twenty-six year-old son (Elder Son), an eighteen year-old daughter (Daughter), and a thirteen year-old son (Minor Son).[5] Erlinda was forty-four years old at the time of her death. She worked as a nurse at a convalescent center.

Adviento, Erlinda, Daughter and Minor Son lived in the downstairs back unit (Adviento unit) of a two-story, three-unit residence. The Adviento unit had two bedrooms. Erlinda and Minor Son shared one bedroom, Daughter stayed in the other bedroom, and Adviento slept in the living room.

Erlinda's co-worker at the convalescent center, Ricardo Dela Merced (Merced), testified that he and Erlinda were "spending a lot of time" together in 2007 and were "real close." Erlinda's children called Merced "Uncle Ricky." Merced was also married; his wife and three children lived in the Philippines. Merced testified that Erlinda told him that she loved him. He acknowledged

telling the police that he would have been with Erlinda if he had not been married.

According to Merced, Erlinda would call him about seven times a day. Minor Son testified that he remembered Adviento questioning Erlinda about the phone bill and Merced's phone number, which appeared on the phone bill "a lot." Minor Son also testified that Erlinda would sometimes bring him and Daughter to Merced's apartment to "just talk." Both Merced and Minor Son testified that Merced, Erlinda, Daughter and Minor Son stayed in a hotel room in Waikiki "for one day and one night."

Adviento testified that in August and September of 2007, prior to Erlinda's death, he took a three-week trip to the Philippines. Elder Son testified that when Adviento returned from his trip, Erlinda had a meeting with Elder Son and Adviento, and Erlinda told Adviento that she wanted a divorce. Adviento reacted by saying, "[I]t's okay." Elder Son suggested that Erlinda "move or go somewhere else before somebody get hurt .... [b]ecause sometimes people get divorced, they end[ ] up fighting.... And lead to something more worse[.]" However, Adviento and Erlinda responded that "nobody will get hurt, we're going to be fine."

During the same meeting, Erlinda and Adviento also accused one another of infidelity. According to Elder Son, Erlinda believed that Adviento was "cheating" during his trip to the Philippines. When Adviento accused Erlinda of also cheating, "[Erlinda] reacted normally, like she wasn't cheating." Adviento's "reaction [was] kind of different, kind of like getting mad[.]" Elder Son testified that the meeting ended without incident: "After that, like it's okay for both of them, like nothing happened when they said that [about divorce]. Okay. My dad go to work. My mom goes to work."

Daughter and Minor Son were also aware that Erlinda and Adviento had discussed divorce and that Erlinda was the one who wanted the divorce. Daughter testified that she had seen the divorce papers.

---

5. The children's ages are taken as of the time of trial.

## 2.

On Sunday, October 28, 2007, Erlinda stayed home from work. Adviento testified that he went to work in the morning and came home at around noon. Daughter was at work that day during all of the relevant times. Minor Son got permission from Erlinda to go to the upstairs apartment in the same building to play with his friends. When Minor Son left Erlinda, she was watching movies in the room that she shared with Minor Son.

Merced testified that he was talking to Erlinda on the cell phone that day. Their conversation was interrupted at some point by "someone's banging the door." Merced testified that he heard a male voice say in Tagalog, "[Y]ou're the one asking some kind of relationship in the Philippines, but you're the one who is—who has a boyfriend." Then there was "banging," and the phone reception was cut off.

On cross-examination, Merced acknowledged that during his first interview with the police he had only stated that he heard "banging" or "knocking" on the door and that he did not hear a male voice. He told police that he knew it was Adviento at the door only because Erlinda told him that Adviento was calling her. Merced explained that he had not been truthful in the first interview because he was confused and afraid that he would be in trouble. Merced testified that it was during his second interview with the police that he said he heard Adviento's voice and that Adviento was "screaming mad" at Erlinda.

Minor Son testified that at some point while he was in the upstairs apartment with his friends, he heard Erlinda scream. He testified that Erlinda "yelled call 911 and to come downstairs and help her." Her screaming went on for a "few minutes" and "shocked and scared" Minor Son. He did not hear Adviento or anyone other than Erlinda yell or scream.

Myrna Villaver (Villaver) lived in the upstairs apartment above the Adviento unit.

She testified that at the relevant time on October 28, 2007, her children, Minor Son, and another friend were in her apartment, playing in the bedroom. At around 2:30 p.m. in the afternoon she heard a female "yell, a scream" coming from downstairs. Villaver described the scream as a "long, unusual scream that that person needed help." She did not hear anyone else scream.

After Minor Son and Villaver heard the scream, they both ran downstairs. Villaver told her children to stay back and asked Minor Son to go to the Adviento unit and ask Erlinda if she was okay. Minor Son walked on the outside of the unit to the window of Erlinda's room. He noticed that the front door to the Adviento unit was closed and locked, even though the door was usually left open and unlocked whenever someone was home during the day. Minor Son could not see into Erlinda's room through the window. Minor Son testified that he asked if everything was okay, and Adviento responded, "Everything's fine." However, Minor Son testified that "at the end ... of what he said, it didn't quite sound very good." Minor Son said that Erlinda did not respond, and he did not hear her voice when he stood outside the window.

Villaver remained closer to the downstairs front unit of the complex while Minor Son went by the window. She testified that Minor Son asked, "[M]om, are you okay," then Villaver heard "a female, I believe it was his mom, saying call 911." Villaver did not hear a male voice.

Villaver called 911. Honolulu Police Department (HPD) Officer Nalei Sooto (Officer Sooto) testified that on October 28, 2007, shortly after he began his shift at 2 p.m., he received an argument call from dispatch. When Officer Sooto arrived at the Adviento residence, Villaver told Officer Sooto "that there was an argument going on for several hours" and "some screaming earlier." [6]

After attempting to open the front door of the Adviento unit, Officer Sooto repeatedly knocked and announced "police." After

---

6. Officer Sooto's testimony was contradicted by Villaver, who testified that she did not hear any arguing prior to Erlinda's scream, and that she did not tell the police officer that there had been an argument for a few hours prior to the scream.

about three minutes, Adviento opened the door. Adviento "was covered in blood" and "appeared to be injured." Officer Sooto asked Adviento what happened, and Adviento responded, "I killed my wife."

Officer Sooto immediately handcuffed Adviento and walked him towards the front of the house where the police car was parked. Officer Sooto described Adviento's demeanor as "[k]ind of dazed, possibly fatigued." There was blood on the "front area" and "sides" of Adviento's body, and "some splatters" on his face. Officer Sooto testified that "[a]s I walked him out, he kind of stated to me that his wife was cheating, she tried to stab him. So he killed her, and then he tried to kill himself after." Adviento took "a couple gasps of breath between each statement he gave." When Officer Soto sat Adviento on the ground against the police car, he noticed injuries to Adviento's collarbone area and wrists.

After other HPD officers arrived on the scene, they entered the Adviento home and found Erlinda on the bedroom floor between the bed and a dresser. She was "covered in blood," her "shirt was partially above her stomach," revealing that she had been cut, and she had no pulse. Erlinda was pronounced deceased at the scene by emergency medical services personnel.

Adviento was transported from the scene in critical condition by ambulance to the Queen's Medical Center emergency room.

### 3.

A white-handled serrated bread knife was recovered from the bedroom floor next to Erlinda's left arm. A second knife with a brown wooden handle was recovered from beside Erlinda's left hand. A bent curtain rod was also found on the floor near Erlinda's body. Two cell phones were found on the bed and a cordless phone was on the floor.

An HPD homicide detective testified that the wounds on Erlinda's body were consistent with a single-edged knife. The detective testified that it was apparent from her investigation that a struggle occurred in the room where Erlinda was found.

The Chief Medical Examiner for the City and County of Honolulu conducted the postmortem examination of Erlinda and testified that excluding cuts on her hands, Erlinda had a total of seventeen wounds on her body. Sixteen of the wounds were stab wounds,[7] and one was a cut to the face. Some stab wounds went through the heart and lung. Erlinda also had "defensive wounds" on the palms and backs of her hands.

The medical examiner testified that Erlinda's wounds were consistent with the two knives recovered from the scene. She concluded that Erlinda's wounds were not self-inflicted, and that Erlinda "died of bleeding from the injuries to the heart and lung as a result of the stab wounds in the chest."

The Queens Hospital trauma surgeon who was in charge of Adviento's care after he was brought into the emergency room testified that Adviento had three open wounds to his front abdomen, three wounds to his neck, and multiple lacerations to his wrists. Internally, Adviento had a collapsed right lung with bleeding into the right chest. During surgery the surgeon found "six perforations of his intestines and an injury to his spleen." The surgeon testified that he could not determine the source of the injuries just by looking at the wounds. Adviento did not have any injuries on other parts of his body, including his face and hands. The surgeon stated that the three stab wounds to Adviento's torso would have caused a great deal of pain.

### D.

The sole witness for the defense was Adviento. Adviento testified that he and Erlinda had been having marital problems for about a year prior to Erlinda's death. According to Adviento, the problems were caused by incidents in which Erlinda said she was working overtime but was not at her workplace when Adviento checked. Adviento

7. The medical examiner defined a "stab wound" as a wound created "when a knife or sharp instrument is plunged into the body, where the depth of the wound is longer than the surface cut of the wound."

acknowledged that he thought Erlinda may have been "fooling around."

Adviento testified that he went to the Philippines for three weeks because he injured his foot at work and Erlinda suggested that he go to visit family. Adviento stayed with Erlinda's family while in the Philippines. When Adviento returned from his trip, Erlinda told him that her sister had called her and said that he was "having an affair and womanizing in the Philippines." Erlinda had told him two or three times prior to this occasion that she wanted a divorce. The last time they discussed divorce was about two to three weeks before Erlinda's death, during the conversation with Elder Son.

On October 28, 2007, Adviento went to work in the morning and returned home at around noon. He did some chores, cooked, and then went to sleep. He testified that he was not aware that Erlinda was home and did not go into or towards Erlinda's room. After Adviento woke up, he went towards Erlinda's room in order to grab a shirt. He was near the door to Erlinda's room when he heard somebody saying, "[S]weetheart, will it be okay if I don't have any present to you?" He testified that he felt "[f]rustrated" when he heard this. He knocked on the door and then entered Erlinda's room.

When Adviento entered the room, he saw Erlinda talking on the cell phone. He told Erlinda, "[Y]ou told me that I was the one making relationship in the Philippines, while the truth is you were the one having a boyfriend over here." Erlinda responded by throwing the cell phone at Adviento. Adviento and Erlinda then began arguing. He did not know how long they argued, but stated that they were "talking kind of loud." According to Adviento, he was "mad" and Erlinda was "very mad" as they continued "arguing back and forth." Adviento told Erlinda to go back to the Philippines and ask her family about his alleged infidelity. He also told Erlinda that he would call her workplace to verify her overtime and the five nights and days when she called in sick from work but was not at home.

Adviento testified that he walked to the phone and he had his back turned to Erlinda while he was dialing the phone. Then he felt a "pain" in his stomach. He looked down and saw blood on his stomach. He testified that he looked at Erlinda and he was "surprised that she had a bow knife on her hands" and that a second knife was close to his stomach. He felt another "stabbing" on his stomach. At that point, Adviento hit Erlinda with the phone he was holding. He testified that he then struggled with Erlinda, took a knife away from her, and stabbed her:

A [Adviento]. Then I push her face. Then I tried to grab her knife on her arms. And I took it away.

While I was struggling on the other hand, with the other knife, I feel another pain on my shoulder.

Q [Prosecutor]. Okay.

A. And after that, I manage to get the knife. I just—I don't know. I was afraid of my life. I thought I was going to die. I got plenty blood.

I just stab her, I don't know how many times. I don't know where, which part of her body I stab. I just kind of afraid that I would die.

I just—why—I went—I fall down on the floor, and she was still coming with me, trying to stab me up.

Q. Okay.

A. I feel pain on my shoulder again. That time I have the chance to grab her right arm. And I never let go. And I just stab, and she fell down on me.

Q. Okay. What happened next?

A. We're still struggling at that time.

Then she wasn't moving. I wasn't moving. I don't know, I just pull her away from me.

Then I struggle to stand up, because my left foot is still swollen and I was favoring it from the surgery. I grab on the—I don't know which one I grab and try to stand up.

(Emphases added).

Adviento testified that after he stood up, he looked at Erlinda lying on the floor and did not know "if she's unconscious or if she's dead." He described his feelings at that point as "shocked."

He testified that he went out to the living room and walked around, "confused," and closed the back and front door of the Adviento unit because he did not want his children to see "what happened to us with my wife." He explained that he then returned to Erlinda's room and slashed his wrists:

A [Adviento]. . . . . Then I went back to the room. I'm still staring and looking at my wife, still shocked, still fear for my life. My wife was stab me to death. She was trying to kill me.

Q [Prosecutor]. So what happened now?

A. I don't know. I just grabbed the knife from her hand and cut.

Q. Why would you do that?

A. She wanted me dead. I would rather be dead—I would rather she be alive, than me. I would rather be dead than her. I just waited over there. I like to die also at that time. I just waited, and waited, and waited.

(Emphasis added).

Adviento remembered the police arriving and questioning him. He testified, "I don't know if I answered them right or wrong, because I was kind of feeling dizzy." He remembered telling the police, "My wife is cheating on me. She stabbed me. She tried to kill me. I killed her." He reiterated that he did not stab Erlinda first. He stated that he realized how many times he had been stabbed when he woke up in the hospital.

After Adviento's testimony, the defense rested.

### E.

The jury exited the courtroom for a short recess prior to the State's rebuttal. The court informed the jurors before they left that "[t]here may be one more witness" after the recess.

The court then addressed the parties regarding the EMED defense, stating that it would instruct the jury on the EMED defense if requested. The court then asked Adviento whether he was giving up his right to assert the EMED defense:

THE COURT: Earlier in this trial, [defense counsel] told me that you were not going to assert the defense of extreme mental or emotional disturbance.

Do you remember that?

THE DEFENDANT: Yes, sir.

THE COURT: Have you discussed the defense of extreme mental or emotional disturbance with [defense counsel]?

THE DEFENDANT: Yes, sir.

THE COURT: Let me just tell you that I would, if requested, instruct the jury on extreme mental or emotional disturbance in this case.

Extreme mental or emotional disturbance is a defense, it's an affirmative defense, that reduces the crime of murder to manslaughter. Murder carries a maximum penalty of life in prison with a possibility of parole. Manslaughter carries a maximum penalty of 20 years.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: So do you understand that if I don't give an instruction on extreme mental or emotional disturbance, the jury will not be able to consider it, and you will be giving up the opportunity to be convicted of the lesser offense of manslaughter?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any questions at all about this?

THE DEFENDANT: No.

THE COURT: Do you give up your right to assert the defense of extreme mental or emotional disturbance?

THE DEFENDANT: Yes, sir.

(Emphases added).

Despite Adviento's responses, the prosecutor questioned whether Adviento needed more time to think about the matter. When the court asked Adviento whether he needed more time to think, he responded, "Yeah, for a while, if I can, please," and explained, "I wasn't expecting this":

THE DEFENDANT: How much time do I have?

THE COURT: Not much. Do you want to talk to [defense counsel]?

THE DEFENDANT: Yeah, for a while, if I can, please.

THE COURT: All right. We'll take a recess, but this

is something you folks should have discussed before now.

THE DEFENDANT: Yes, sir.

THE COURT: You have already told me this was it. But—

THE DEFENDANT: Yeah. I wasn't expecting this.

THE COURT: All right. Mr. Adviento, I don't mean to force you to a decision one way or the other. You can change your mind if you want to. But I'm not going to give you too much time to do that. So we'll take a break.

(Emphases added).

Upon reconvening after a short break, defense counsel informed the court that he and Adviento had discussed the matter "quite extensively prior to" and that Adviento "just had a few clarification questions." The court then addressed Adviento and obtained a waiver of the EMED defense, and concluded that because of the waiver, the court's "ruling as to the other incidents" would not be allowed:

THE COURT: Have you made your decision about whether or not to assert the defense of—

THE DEFENDANT: Yes, sir, Your Honor.

THE COURT:—extreme mental or emotional disturbance?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And what is your decision?

. . . .

THE DEFENDANT: We will go for the self-defense.

THE COURT: All right. But you will not raise the defense of extreme mental or emotional disturbance?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Then the Court will find that the Defendant have been fully informed has knowingly, intelligently and voluntarily waived any jury instruction on extreme mental or emotional disturbance.

So that the Court's ruling as to the other incidents, violence perhaps in [the] relationship will not be allowed.

(Emphases added).

### F.

Subsequently, the jury re-entered the courtroom, and the State proceeded with its rebuttal evidence. The State recalled Daughter, who testified that Erlinda was "very nice, very caring. She never tried to do any harm. Very peaceful." The State did not call the fingerprint examiner to testify regarding Adviento's prior assault conviction.

Prior to giving the jury instructions, the court noted to the parties that the EMED instruction would be withdrawn. The jury was subsequently instructed by the court on the offense of murder in the second degree, the included offense of reckless manslaughter, and the defense of justifiable use of force.

On July 17, 2009, the jury reached a unanimous verdict finding Adviento guilty as charged of the offense of murder in the second degree. The court sentenced Adviento to a term of life imprisonment with the possibility of parole, with a mandatory minimum term of ten years. The court filed its Judgment on October 21, 2009.

### II.

### A.

On appeal to the ICA, Adviento argued that the circuit court "abused its discretion when it erroneously ruled that evidence of Adviento's prior assault conviction would be admissible to rebut the defense of EMED." [8]

---

**8.** On appeal to the ICA, Adviento also argued: 1) the circuit court plainly erred in permitting the prosecution to engage in numerous instances of prosecutorial misconduct during closing argument, or alternatively defense counsel was ineffective when he failed to object to these instances of misconduct; and 2) defense counsel was ineffective when he failed to adduce evidence of Adviento's injuries to substantiate the self-defense claim, and evidence of Erlinda's five-day

Adviento contended that the circuit court "correctly recognized at the conclusion of the presentation of the evidence, that the EMED instruction was necessary" because Adviento's testimony established "that there was a reasonable explanation for Adviento's EMED" defense. He argued that "considering the circumstances that Adviento subjectively believed at the time—i.e. his shock that his wife of 24 years would try to kill him when he was confronting her about her lies and her affair," Adviento's "resulting EMED, of shock, anger and dismay, was objectively reasonable."

Adviento contended that the circuit court's ruling that his prior assault conviction would be admissible to rebut the EMED defense was an abuse of discretion. The conviction was not admissible under HRE Rule 404(b) pertaining to the admissibility of evidence of other crimes, wrongs or acts, or under HRE Rule 403 regarding the exclusion of relevant evidence if its probative value is substantially outweighed by certain considerations. Adviento also argued that the circuit court's ruling was inconsistent with the analysis set forth in *State v. Pinero*, 70 Haw. 509, 778 P.2d 704 (1989) for the admission of other criminal acts of the defendant.[9]

Thus, Adviento contended that the assault conviction was not admissible under the HRE or to rebut his EMED defense, and the court's erroneous ruling admitting the conviction caused him to forgo the EMED defense. The absence of the EMED instruction was not harmless beyond a reasonable doubt and "impinged on Adviento's constitutional rights to present a defense and his due process right to a fair trial."

Relatedly, Adviento claimed that his trial counsel was ineffective in advising him to waive the EMED defense because the record supported the defense and the circuit court recognized that the EMED instruction was warranted.

In response, the State argued that the circuit court did not actually rule on the admissibility of the assault conviction, but took "the matter under advisement until the parties presented all evidence relevant to the admission of his conviction." The issue of the conviction's admissibility "became moot when Defendant decided not to pursue 'EMED' as a defense, [and] therefore, the trial court never issued a ruling that ripened into a justiciable controversy."

Regarding Adviento's ineffective assistance of counsel claim, the State argued that the record did not establish trial counsel's rationale for advising Adviento to waive the EMED defense. Thus, even assuming that the evidence raised an EMED defense, Adviento failed to meet his burden of demonstrating that the decision to forgo the EMED defense resulted in a denial of his right to present a defense or to effective assistance of counsel.

Adviento responded that while the circuit court initially deferred its ruling because it was not sure how Adviento would raise the EMED defense, the court later ruled that the prior conviction would be admissible to rebut an EMED defense. Specifically, the circuit court stated just after taking Adviento's waiver, "So that the Court's ruling as to the other incidents, violence perhaps in [the] relationship will not be allowed." Adviento argued that this statement by the court "explicitly refer[ed] to its ruling of not allowing admission of 'other incidents' of 'violence' in the relationship."

absence from home and work to establish Erlinda's motive for being the first aggressor. The ICA rejected both claims. *State v. Adviento*, No. 30171, 128 Hawai'i 128, 2012 WL 2864226, at *13–16 (Haw.App. Jul. 10, 2012) (mem.). These issues are not further addressed as they are not raised in Adviento's application for writ of certiorari.

9. In *Pinero*, the court held that the trial court must weigh a variety of factors before ruling that evidence of the defendant's other criminal act is admissible to prove a fact in consequence. *Id.* at

518, 778 P.2d at 711. These factors include "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the time that has elapsed between them, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." *Id.* (quotation marks and citation omitted). Adviento argued that the circuit court did not correctly apply the *Pinero* analysis before ruling that Adviento's prior assault conviction would be admissible to rebut the EMED defense.

### B.

The ICA held that "Adviento is not entitled to any relief based on the manner in which the Circuit Court handled the issue of the admissibility of his prior assault conviction." *State v. Adviento*, No. 30171, 128 Hawai'i 128, 2012 WL 2864226, at *5 (Haw.App. Jul. 10, 2012) (mem.). The ICA agreed with the State that the circuit court did not actually issue a ruling that Adviento's prior assault conviction would be admissible to rebut an EMED defense, but merely decided to withhold "its ruling on the admissibility of the assault conviction until it understood the nature and substance of any EMED defense that Adviento intended to raise." *Id.* at *8. The ICA understood the circuit court's statements on the prior conviction and the EMED defense to be "definite" only in the sense that "*if* [the circuit court] decided to permit evidence of the prior assault to rebut an EMED defense, only the third-degree assault conviction, and not the specific underlying facts, would be permitted." *Id.* at *8 n. 6.

The ICA agreed with the State that "Adviento's subsequent decision to waive any EMED defense made it unnecessary for the Circuit Court to rule on the admissibility of the assault conviction." *Id.* at *8. The ICA thus characterized the "posture of [Adviento's] appeal" as one in which the defendant was "seeking to vacate his conviction based on a trial court's decision to withhold ruling on the admissibility of evidence (which was never actually admitted at trial)[.]" *Id.*

After determining that the circuit court did not rule on the admissibility of Adviento's prior conviction, the ICA held that the circuit court did not err in withholding its decision until the nature and substance of Adviento's possible EMED defense became clearer.[10] *Id.* at *11. In reaching its holding, the ICA stated that the "Hawai'i Supreme Court has concluded that prior bad acts involving domestic violence committed against the alleged victim may be admissible to rebut a defendant's EMED defense, where the EMED defense is based on the defendant's relationship with the alleged victim." *Id.*

(citing *State v. Maelega*, 80 Hawai'i 172, 183–84, 907 P.2d 758, 769–70 (1995)). Thus, the ICA reasoned that the relevance of Adviento's prior conviction depended upon the nature and substance of Adviento's possible EMED defense. *Id.* According to the ICA, "Adviento did not proffer or provide details of the possible EMED defense he might raise." *Id.* Under the circumstances, the circuit court did not err in withholding its ruling "until Adviento provided details of the nature and substance of the EMED defense he intended to raise." *Id.*

The ICA further noted that "Adviento's own testimony at trial refute[d] any substantial EMED defense arising out of [Erlinda's] alleged infidelity[,]" given that Adviento testified that Erlinda's act of stabbing him in the stomach prompted him to stab her. *Id.* at *12. The ICA concluded that if Adviento had sought to assert an EMED defense based on his shock over Erlinda's attempt to kill him, then the circuit court would have prevented the prior conviction from being admitted into evidence, as the court had "plainly stated it would only consider admitting the assault conviction if Adviento asserted an EMED defense that was based on the nature of his relationship with his wife." *Id.*

On the issue of whether defense counsel provided ineffective assistance of counsel in advising Adviento to waive the EMED defense, the ICA found that that "record reflects that Adviento made the decision to waive reliance on an EMED defense; it does not show what advice Adviento's trial counsel gave Adviento regarding this decision or whether trial counsel even advised Adviento to forego asserting an EMED defense." *Id.* at *13. The ICA nevertheless determined that "[b]ased on the record and under the circumstances of this case, we cannot say that it would have been unreasonable for competent defense counsel to advise Adviento to forego asserting a possible EMED defense and instead to rely solely on a claim of self-defense." *Id.* "Adviento's trial counsel could have rationally concluded that a claim of EMED would have detracted from or con-

---

10. The ICA extensively discussed the reviewability of a trial court's in limine rulings, but ultimately decided to assume for the purposes of the appeal that the circuit court's ruling deferring its decision on the conviction's admissibility was reviewable. *Id.* at *8–10.

flicted with a claim of self-defense and that Adviento would be better off relying solely on a claim of self-defense." *Id.*

Although the ICA thus concluded that Adviento failed to prove ineffective assistance of counsel, given that the record did not "reflect the particular advice trial counsel gave to Adviento or the reasons for counsel's advice," the court did not "preclude Adviento from raising a claim of ineffective assistance of counsel with respect to the advice he received on asserting an EMED defense, in a Hawai'i Rules of Penal Procedure (HRPP) Rule 40 proceeding based on a more fully developed record." *Id.*

The ICA therefore affirmed Adviento's conviction. *Id.* at *16.

### III.

In his application for writ of certiorari to this court, Adviento presented the following questions:

I. Whether the ICA gravely erred in holding that Petitioner is not entitled to any relief based upon the manner in which the circuit court handled the issue of the admissibility of his prior assault conviction, which caused Petitioner to forego an instruction on the extreme mental or emotional disturbance (EMED) defense; and

II. Whether the circuit court was obligated to instruct the jury on the EMED defense upon determining that there was sufficient evidence in the record to support the giving of the instruction, even where Petitioner waived the defense.

We first address the question of the trial court's duty to instruct the jury on the EMED defense when the defense is raised by the evidence.

### A.

■ "[I]n our judicial system, the trial courts, not the parties, have the duty and ultimate responsibility to insure that juries are properly instructed on issues of criminal

liability." *State v. Haanio,* 94 Hawai'i 405, 415, 16 P.3d 246, 256 (2001), *overruled in part on other grounds, State v. Flores,* 131 Hawai'i 43, 314 P.3d 120 (2013). "[I]t is the trial judge's duty to insure that the jury instructions cogently explain the law applicable to the facts of the case and that the jury has proper guidance in its consideration of the issues before it." *State v. Locquiao,* 100 Hawai'i 195, 205, 58 P.3d 1242, 1252 (2002) (citing *State v. Robinson,* 82 Hawai'i 304, 311–12, 922 P.2d 358, 365–66 (1996)) (quotation marks omitted). *See State v. Hoey,* 77 Hawai'i 17, 38–39, 881 P.2d 504, 525–26 (1994) ("it is the duty of the circuit judge to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide, and he or she shall state to them fully the law applicable to the facts") (quotation marks, brackets and citations omitted).

■ In this case, Adviento was charged with second-degree murder, an offense carrying a penalty of life imprisonment with the possibility of parole. *See* HRS § 707–701.5; HRS § 706–656(2). EMED is an affirmative defense to murder or attempted murder,[11] "which reduces the offense to manslaughter or attempted manslaughter" if "the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation." HRS § 707–702(2). "The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be." *Id.*

■ As the ICA recognized in this case, EMED "is not a complete defense" that, "if accepted by the jury, entitles a defendant to a verdict of not guilty." *Adviento,* 2012 WL 2864226, at *13. Rather, a successful EMED defense reduces the offense from murder to manslaughter. Manslaughter is a class A felony, HRS § 707–702(3), for which the sen-

---

11. HRS § 707–702(2) was amended in 2003 to provide that EMED is an affirmative defense. 2003 Haw. Sess. Laws Act 64, § 1. "If the defense is an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds

that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability." HRS § 701–115(2)(b) (1993).

tence is "an indeterminate term of imprisonment of twenty years without the possibility of suspension of sentence or probation," HRS § 706–659. Thus, "[a]lthough [HRS § 707–702(2) ] refers to the mental state of a defendant as a defense, it is really a mitigating factor. Intentionally killing while under the influence of extreme emotional disturbance does not present a true 'defense,' for the punishment is merely reduced through the mechanism of denominating the crime as 'manslaughter' rather than 'murder'." *State v. Dumlao*, 6 Haw.App. 173, 175 n. 2, 715 P.2d 822, 825 n. 2 (1986), *overruled in part on other grounds by State v. Seguritan*, 70 Haw. 173, 766 P.2d 128 (1988) (quotation marks omitted).[12]

In the context of jury instructions on the EMED defense, our courts have held that it is the trial court's obligation to provide an EMED instruction when "the record reflects <u>any</u> evidence ... that the defendant acted under a loss of self-control resulting from [EMED]." *State v. Aganon*, 97 Hawai'i 299, 304, 36 P.3d 1269, 1274 (2001). *See State v. Sawyer*, 88 Hawai'i 325, 333, 966 P.2d 637, 645 (1998); *State v. Moore*, 82 Hawai'i 202, 921 P.2d 122 (1996); *State v. Pinero*, 70 Haw. 509, 525, 778 P.2d 704, 714–15 (1989).

■ This court on review has examined whether the trial court erred in not giving the EMED instruction notwithstanding the fact that neither the prosecution nor the defense requested an EMED instruction at trial. In *Sawyer*, the State withdrew its proposed instruction on EMED manslaughter without defense objection. 88 Hawai'i at 328, 966 P.2d at 640. On appeal, the defendant argued "that the trial court committed plain error when it failed, sua sponte, to instruct the jury on attempted EMED manslaughter." *Id.* In determining whether the trial court committed plain error, the *Sawyer* court first explained that "<u>the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel</u>." *Id.* at 333, 966 P.2d at 645 (quotation marks, ellipses and brackets omitted) (emphasis added). With respect to the "mitigating defense of attempted EMED manslaughter," the court noted that "[m]uch confusion has arisen over whether the court or the jury determines the reasonableness of the defendant's explanation or excuse" for the extreme mental or emotional disturbance. 88 Hawai'i at 333, 966 P.2d at 645.

■ In order to resolve such confusion, the court held "that the trial court determines whether or not the record reflects <u>any</u> evidence of a subjective nature that the defendant acted under a loss of self-control resulting from extreme mental or emotional disturbance." [13] *Id.* "[I]f the record reflects *any* evidence of a subjective nature that the defendant acted under the influence of extreme mental or emotional disturbance, then the issue must be submitted to the jury, and the trial court should instruct the jury on EMED manslaughter." *Id.* (emphases added). In that case, the court determined that the "trial court did not [plainly] err when it instructed the jury on self-defense, without instructing the jury on attempted EMED manslaughter," because "the record was devoid of <u>any</u> evidence that Defendant acted while under the influence of a reasonably induced loss of self-control due to extreme

---

**12.** *Dumlao* was overruled in part by *Seguritan*, to the extent that the discussion of EMED manslaughter in *Dumlao* suggested that the defendant is required to be exposed to an "extremely unusual and overwhelming stress." *See Seguritan*, 70 Haw. at 174, 766 P.2d at 128–29. The *Seguritan* court held that HRS § 707–702(2) focuses "on the defendant's reaction to the stress, and requires only that the defendant be under the influence of extreme mental or emotional disturbance for which there is 'a reasonable explanation'." 70 Haw. at 174, 766 P.2d at 129. "The disapproved language [in *Dumlao*] was drawn from *People v. Shelton*, 88 Misc.2d 136, 385 N.Y.S.2d 708, 717 (Sup.1976).... The remainder of *Dumlao's* analysis of EMED man-

slaughter remains good law." *State v. Moore*, 82 Hawai'i 202, 211 n. 9, 921 P.2d 122, 131 n. 9 (1996).

**13.** The *Sawyer* court explained that "the defendant must satisfy a subjective/objective test in proffering a reasonable explanation in accordance with HRS § 707–702(2). First, in satisfying the subjective portion, the record must reflect the circumstances as the defendant believed them to be. Second, in satisfying the objective portion, the record must support a reasonable explanation or excuse for the actor's disturbance." *Id.* at 333, 966 P.2d at 645.

mental or emotional disturbance." *Id.* at 334, 966 P.2d at 646.

Similarly in *Moore*, the court examined whether the trial court plainly erred by failing to instruct the jury on the EMED defense, although the prosecution withdrew its proposed EMED instruction without objection by the defense. 82 Hawai'i at 209–10, 921 P.2d at 129–30. The court held that it did not need to decide whether the trial court's failure to instruct the jury on the EMED defense was plain error "because the record in this case is <u>entirely devoid of any evidence</u> supporting a theory of attempted EMED manslaughter in the first instance." *Id.* at 210, 921 P.2d at 130 (emphasis added). In that case, there was no testimony presented of the defendant's state of mind at the time he shot the complainant, as only the defendant and complainant had such knowledge, and neither testified. *Id.*

In *Aganon*, the court again reviewed whether the trial court plainly erred by not instructing the jury on the EMED defense, although neither the prosecution nor defense objected to the lack of instruction. 97 Hawai'i at 302, 36 P.3d at 1272. Upon reviewing the evidence presented at trial, the court held that the trial court did not plainly err in not giving the EMED instruction, as the defendant presented only "generalized testimony that she loses her temper in stressful situations" and that the decedent, an infant, "could cry a lot." *Id.* at 304, 36 P.3d at 1274.

■  Accordingly, this court's cases on the EMED defense demonstrate that the trial court's obligation to instruct the jury on the EMED defense when it is raised by the evidence does not depend on a request for the instruction by the defense or prosecution. Rather, the trial court's obligation to sua sponte instruct the jury on the EMED defense arises when the record reflects "<u>any</u> evidence of a subjective nature that the defendant acted under the influence of extreme mental or emotional disturbance." *Sawyer*, 88 Hawai'i at 333, 966 P.2d at 645.

■  This approach to jury instructions is also reflected in this court's treatment of the mitigating defense of assault in the third degree in the course of a mutual affray. Under HRS § 707–712(2), the offense of assault in the third degree is reduced from a misdemeanor to a petty misdemeanor when the assault is committed during a fight or scuffle entered into by mutual consent. "In other words, mutual affray is a mitigating defense that reduces the offense of Assault in the Third Degree to a petty misdemeanor."[14] *State v. Kikuta*, 125 Hawai'i 78, 96, 253 P.3d 639, 657 (2011).

■  In *Kikuta*, this court held that the trial court must instruct the jury on the mutual affray defense when there is "any evidence" supporting the instruction. *Id.* at 96, 80–81, 253 P.3d at 641–42, 657. The defendant in that case had been charged with and convicted of assault in the third degree. *Id.* at 81, 253 P.3d at 642. The defendant did not request a jury instruction on the mutual affray defense. *See id.* at 84, 253 P.3d at 645.

On appeal, the defendant argued that the trial court erred in failing to instruct the jurors on the mutual affray defense. *Id.* Upon reviewing the evidence, the *Kikuta* court agreed, finding that "there was some evidence adduced that the injury to Complainant occurred during the course of a fight or scuffle entered into by mutual consent." *Id.* at 96, 253 P.3d at 657. The court referenced testimony by the complainant that prior to the assault, he stood up with his crutch and "figured" that the defendant "thought he was going to whack him with it," and testimony by the defendant that the complainant swung the crutch at him. *Id.* at 96–97, 253 P.3d at 657–58. Such testimony constituted "evidence from which it could be implied that, from that point, Complainant had impliedly consented to a fight or scuffle with [the defendant]." *Id.* at 97, 253 P.3d at 658. The court noted that "[i]n as much as the testimony of Complainant and [the defendant] differ, it is not for this court to determine whether the testimony of one was more credible than

---

**14.**  The *Kikuta* court compared the mutual affray defense to the EMED defense under HRS § 707– 702(2). 125 Hawai'i at 96, 253 P.3d at 657.

the other." *Id.* Rather, "the court must submit a mutual affray instruction to the jury when there is <u>any evidence</u> in the record that the injury was inflicted during the course of a fight or scuffle entered into by mutual consent[.]" *Id.* at 96, 253 P.3d at 657. The court therefore vacated the defendant's conviction based on the trial court's failure to give the mutual affray instruction. *Id.* at 96–97, 253 P.3d at 657–58.

Thus, the trial court's obligation to instruct the jury on the EMED defense when it is raised by the evidence does not depend on a request for the instruction by the defense or prosecution.[15]

## B.

▇▇▇ Because the trial court's duty to instruct the jury on the relevant law is independent of the defense or prosecution's trial strategy, a trial court is not permitted to elicit a defendant's waiver of the EMED defense.[16] Permitting such a waiver would interfere with the trial court's role in instructing the jury on the relevant law and the jury's role in rendering verdicts based on the evidence presented.

Much of the rationale for requiring the trial court to give the EMED instruction based on the evidence rather than based on the defendant's trial strategy has already been enunciated by this court in *State v. Haanio,* 94 Hawai'i 405, 16 P.3d 246 (2001).

▇▇▇ In *Haanio,* this court held that "trial courts shall instruct juries as to any included offenses[17] having a rational basis in the evidence without regard to whether the prose-

cution requests, or the defense objects to, such an instruction." *Id.* at 407, 16 P.3d at 248. In so holding, the court rejected the idea that the defendant or prosecution should be permitted to forgo included offense instructions for tactical or strategic reasons. *Id.* at 414, 16 P.3d at 255.

The defendant in *Haanio* had argued that the trial court erred in instructing the jury on several lesser included offenses over his objection and in the absence of the prosecution's request. *Id.* at 410, 16 P.3d at 251. In particular, the defendant argued that "a defendant should be allowed to waive proposed lesser-included offense instructions and risk conviction of the charged offense for the chance of obtaining an outright acquittal." *Id.*

▇▇▇ The court, however, recognized that the approach advocated by the defendant is a "strategy that permits parties in a criminal trial to forego instructions on provable lesser-included offenses, thereby forcing the jury to choose between conviction and acquittal on the greater charge." *Id.* (citation omitted). The court rejected acceding to such an "all or nothing" approach on the basis that it would contravene the most fundamental objectives of the judicial system, to accurately assess criminal liability and punishment:

> The judicial objectives within the context of the criminal justice system are to assess criminal liability and to determine appropriate punishment if and when warranted. <u>Acceding to an 'all or nothing' strategy,</u> albeit in limited circumstances, <u>forecloses the determination of criminal liability</u>

---

15. This requirement is consistent with this court's decision in *State v. Taylor,* 130 Hawai'i 196, 307 P.3d 1142 (2013), as discussed infra part III(C)(2).

16. This was recognized initially by the prosecutor in this case, who stated prior to the commencement of trial that it was his understanding that the court's instruction on the EMED defense was determined by the evidence rather than by the defendant: "I don't know if he [Adviento] can make that decision [to not assert the EMED defense] if the evidence comes out ... in other words, I think it's the evidence that decides."

17. HRS § 701–109(4) (1993) defines an included offense as follows:

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:
(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
(b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or
(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

where it may in fact exist. Thus, elevating a 'winner take all' approach over such a determination is detrimental to the broader interests served by the criminal justice system.

*Haanio*, 94 Hawai'i at 414, 16 P.3d at 255 (emphases added); *State v. Flores*, 131 Hawai'i 43, 51, 314 P.3d 120, 128 (2013).

█ The *Haanio* court also noted that it "discern[ed] no constitutional or substantial right of a defendant not to have the jury instructed on lesser included offenses." *Haanio*, 94 Hawai'i at 414–15, 16 P.3d at 255–56. The court explained that it is the trial court's duty to properly instruct the jury on issues of criminal liability, and the jury's correlative duty is to "render true verdicts" based on the evidence:

> Rather, in our judicial system, the trial courts, not the parties, have the duty and ultimate responsibility to insure that juries are properly instructed on issues of criminal liability. Correlatively, juries are obligated to render true verdicts based on the facts presented; hence, barring their consideration of lesser included offenses supported by the evidence undermines their delegated function.

*Haanio*, 94 Hawai'i at 415, 16 P.3d at 256 (internal citations omitted) (emphases added); *Flores*, 131 Hawai'i at 56, 314 P.3d at 133.

Most significantly, the court concluded that "an all or nothing approach impairs the truth seeking function of the judicial system:

> Our courts are not gambling halls but forums for the discovery of truth .... A trial court's failure to inform the jury of its option to find the defendant guilty of the lesser offense would impair the jury's truth-ascertainment function. Conse-

quently, neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged. To permit this would force the jury to make an 'all or nothing' choice between conviction of the crime charged and complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence.

*Haanio*, 94 Hawai'i at 415, 16 P.3d at 256 (emphases added); *Flores*, 131 Hawai'i at 56, 314 P.3d at 133.

Permitting the defendant to waive an EMED defense that is raised by the evidence promotes the same "all or nothing" approach that the *Haanio* court advocated so strongly against. The circuit court in this case took Adviento's purported waiver of the EMED defense even though the court recognized that the EMED instruction was warranted ("I would, if requested, instruct the jury on extreme mental or emotional disturbance in this case"). Adviento, apparently believing that he needed to waive the EMED defense in order to prevent the admission of the prior conviction,[18] informed the court, "We will go for the self-defense," and waived the EMED defense.

Because of Adviento's purported waiver, the jury was not instructed on the mitigating defense of EMED. As a consequence, the jury was essentially presented with only two options: convict Adviento of murder in the second degree, or acquit him outright based on self-defense.[19] By eliciting Adviento's waiver of the EMED instruction, Adviento was placed in a position where he was able to

---

18. *See infra* note 24.

19. The jury was also instructed on the included offense of reckless manslaughter. However, the jury could only consider whether Adviento was guilty of reckless manslaughter if it first found Adviento not guilty of murder in the second degree, or if it was unable to reach a unanimous verdict as to that offense. In light of Adviento's admission that he stabbed Erlinda, and the evidence showing sixteen stab wounds with several fatal wounds to the vital organs, it was highly unlikely that the jury would find that Adviento did not act knowingly and intentionally.

The EMED instruction, however, would have allowed the jury to consider whether Adviento acted knowingly and intentionally, but under the influence of EMED. The EMED defense "has been characterized as voluntary manslaughter because it involves the intentional or knowing killing of another while under the influence of a reasonably induced extreme mental or emotional disturbance causing a temporary loss of normal self-control." *Pinero*, 70 Haw. at 524, 778 P.2d at 714 (internal quotation marks, brackets, ellipses, and citations omitted).

gamble between conviction and complete acquittal, despite the recognition by the circuit court that the jury could have found that Adviento acted under the influence of EMED. As a consequence, the jury was precluded from determining "criminal liability where it may in fact [have] exist[ed]." *Haanio*, 94 Hawai'i at 414, 16 P.3d at 255.

■ "Juries are obligated to render true verdicts based on the facts presented" rather than based on the strategic choices made by the defense or prosecution. *Id.* at 415, 16 P.3d at 256. Thus, just as "barring [the jury's] consideration of lesser included offenses supported by the evidence undermines their delegated function" of determining criminal liability, *id.*, barring the jury's consideration of the EMED defense when it is supported by the evidence results in the same adverse consequence.

On the one hand, in an unsympathetic case, a jury that is not instructed on the EMED defense is more likely to resolve any doubt in favor of conviction rather than acquittal. *Cf. Keeble v. United States*, 412 U.S. 205, 212–13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) (requiring instruction on lesser-included offenses protects defendant from the danger that "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of <u>some</u> offense, the jury is likely to resolve its doubt in favor of conviction"); *Beck v. Alabama*, 447 U.S. 625, 642, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) ("the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason-its belief that the defendant is guilty of some serious crime and should be punished"). On the other hand in a sympathetic case, the jury may resolve any doubts in favor of acquittal despite an insubstantial self-defense claim because the jury does not want the defendant to be convicted of murder. Both alternatives "impair the jury's truth-ascertainment function," *Haanio*, 94 Hawai'i at 415, 16 P.3d at 256 (citation omitted), by denying the jury the opportunity to accurately determine the defendant's criminal liability based on the evidence that was presented to it.

■ Additionally, allowing defendants to waive the EMED defense when it is raised by the evidence would "unduly complicate[ ] the trial court's ultimate obligation to promote justice in criminal cases." *Id.* at 414, 16 P.3d at 255 (citing *State v. Kupau*, 76 Hawai'i 387, 879 P.2d 492 (1994)). Prior to *Haanio*, this court in *Kupau* attempted to resolve the issue of the trial court's duty to give included offense instructions by balancing all of the relevant interests of the State and the defense. 76 Hawai'i at 394–96, 879 P.2d at 499–501.

Importantly, the *Kupau* court reasoned that both the defendant and prosecution may have legitimate interests in presenting or preventing included offense instructions for tactical or strategic reasons. *Id.* at 394–95, 879 P.2d at 499–500.

Thus, "in order to reconcile the competing interests of the prosecution and defendants," the *Kupau* court developed a complex, multi-layered rule in which the trial judge was required to instruct the jury on lesser included offenses supported by the evidence "unless (1) the prosecution does not request that included instructions be given and (2) the defendant specifically objects to the included offense instructions for tactical reasons." *Id.* at 395–96, 879 P.2d at 500–01. If this occurred, then the trial judge was required to "exercise his or her discretion as to whether the included offense instructions should be given," "guided by the nature of the evidence presented during the trial, <u>as well as the extent to which the defendant appears to understand the risks involved</u>." *Id.* (footnote omitted) (emphasis added).

Seven years later, *Kupau* was overruled by *Haanio* because it "unduly complicated the trial court's ultimate obligation to promote justice in criminal cases." 94 Hawai'i at 414, 16 P.3d at 255. Justice Levinson, who authored the *Kupau* opinion, wrote in *Haanio* that "[w]ith the benefit of hindsight, I am now of the view that the roadmap drawn in *Kupau* ... is at best unhelpful, at worst confusing, and probably incompatible with the proposition that the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel."

*Id.* at 420–21, 16 P.3d at 261–62 (Levinson, J., concurring).

Similar complications to those identified in *Haanio* would result if the defense was permitted to waive an EMED instruction for tactical reasons.

First, a defendant would only attempt to waive an EMED instruction when it was perceived to be in the defendant's favor to do so.[20] Such a defendant would be gambling that the jury is more likely to acquit him or her entirely of murder or attempted murder if the jury is precluded from considering the third option of convicting the defendant of EMED manslaughter. In such a situation, the State certainly has an interest in preventing the waiver in order to give the jury the opportunity to convict the defendant of manslaughter. Additionally, the State will always have an interest in obtaining a true verdict in order to further justice.

The trial court would then be required to "steer[ ] through the competing interests" of the parties and determine, at the risk of error, whether or not to give the instruction. 94 Hawai'i at 414, 16 P.3d at 255. Unless the defendant was given the absolute right to waive the EMED defense along with the correlative right to override the prosecution's "legitimate interest" in requiring the EMED instruction to be given, a trial court's exercise of discretion in permitting or denying the waiver would likely be challenged on appeal.[21]

■ Furthermore, if the defendant was given the unilateral right to waive the EMED defense without regard to the prosecution's objections, the defense would essentially be able to manipulate the jury by adducing evidence of mental or emotional disturbance for the purpose of inducing doubt or sympathy and then waiving the EMED instruction in order to put the jury in an "all or nothing" position. The State would also be greatly prejudiced if the evidence of murder or attempted murder is not as strong as anticipated, and the defense has the unilateral ability to control whether the jury is instructed on EMED manslaughter. Such outcomes are entirely antithetical to the objectives of the criminal justice system, "to assess criminal liability and to determine appropriate punishment if and when warranted," *Haanio*, 94 Hawai'i at 414, 16 P.3d at 255. Thus, permitting the defense to waive the EMED defenses where it is sufficiently raised by the evidence would undoubtedly undermine public confidence in the fairness of the judicial system.

■ Second, as the *Kupau* court indicated, 76 Hawai'i at 396, 879 P.2d at 501 ("trial judge's discretion should be guided by ... the extent to which the defendant appears to understand the risks involved"), the trial court's obligation to properly instruct the jury on the applicable law would be further complicated by permitting the defendant to waive an EMED instruction, as the court would be required to determine whether the defendant's waiver was valid. As with any situation in which the defendant is relinquishing a known right, the defendant's waiver of the EMED defense would have to be "knowing, intelligent, and voluntary." *State v. Friedman*, 93 Hawai'i 63, 68, 996 P.2d 268, 273 (2000). Thus, permitting the defendant's waiver would raise additional concerns over the trial court's waiver colloquy with a defendant.[22]

---

20. In this case, the ICA speculated that "Adviento's trial counsel could have rationally concluded that a claim of EMED would have detracted from or conflicted with a claim of self-defense and that Adviento would be better off relying solely on a claim of self-defense." 2012 WL 2864226, at *13.

21. If the defendant decides to gamble on acquittal and the trial court accedes to the defendant's request to waive the EMED instruction and the defendant is convicted of murder, then the trial court's decision to permit the waiver would almost certainly be challenged on appeal. Con-

versely, if the trial court denies the defendant's request to waive the EMED instruction and the defendant is convicted of EMED manslaughter, the trial court's decision would also be subject to challenge.

22. For example, in this case the court did not inform Adviento that as an affirmative defense, the defense need only prove EMED by a preponderance of the evidence, and if the jury was not unanimous as to whether EMED was proved or not proved, then a verdict could not be returned upon the murder charge. *See* Hawai'i Standard Jury Instructions Criminal (HAWJIC) 9.08 ("If

The difficulty in determining whether a defendant's waiver of the EMED defense was knowing, intelligent, and voluntary is exemplified by the record in this case, where Adviento appeared to waive the defense based on his understanding that he was required to do so in order to prevent his prior assault conviction from being admitted by the State on rebuttal,[23] and appeared uncertain of his waiver even after the court engaged him in a colloquy.[24]

■ Relatedly, permitting defendants to waive the EMED defense may also lead to ineffective assistance of counsel claims based on defense counsel's advice regarding the waiver. In this case, Adviento argued to the ICA that his trial counsel provided ineffective assistance in advising him to waive the EMED defense. 2012 WL 2864226, at *16. The ICA held that Adviento failed to meet his burden of proving ineffective assistance, but did not preclude Adviento from raising the same claim in a HRPP Rule 40 proceeding because the record "[did] not reflect the particular advice trial counsel gave to Adviento or the reasons for counsel's advice." *Id.*

The complexities that arise from permitting the defendant to waive the EMED instruction in a jury trial can be contrasted to the parallel situation in a jury-waived trial. In a jury-waived trial, the trial court would be cognizant of the EMED defense and factor the defense into its consideration in reaching its verdict. If a defendant in a jury-waived trial had the right to waive the EMED instruction, the trial judge would effectively be <u>compelled</u> to not consider a defense that is applicable based on the evidence presented. Thus the trial judge would be forced to reach an "untrue" verdict not based on the facts but instead dictated by the defendant's trial strategy. Our courts are a forum for justice and truth-seeking; thus a defendant should not be entitled to compel a judge to not consider the law that is applicable to the evidence presented at trial.[25] Sim-

you are unable to reach a unanimous agreement as to whether the prosecution has proved, or failed to prove, that the defendant was not under the influence of extreme mental or emotional disturbance, then your decision is not unanimous and a verdict may not be returned on this offense.").

23. Following the court's initial limine ruling to defer its decision on the admissibility of the prior assault conviction, defense counsel informed the court that he and Adviento had "discussed the Court's pretrial rulings, defense and the type of evidence and things of that nature," and that based on Adviento's decision, the defense would not be asserting the EMED defense.

After Adviento's purported "waiver" of the EMED defense, the court stated, "So that the Court's ruling as to the other incidents, violence perhaps in [the] relationship will not be allowed."

The dissent acknowledges that Adviento's "waiver of the EMED instruction may have been partially motivated by his desire to prevent his prior conviction from coming into evidence." Dissent at 163, 319 P.3d at 1171. However, the dissent argues that the connection between the waiver and the admissibility of the prior conviction has no effect on the validity of the waiver, as evidence of the prior conviction "may have been partially admissible to rebut an EMED defense based on the Advientos' relationship." *Id.* at 163–64, 319 P.3d at 1171–72. This argument appears contrary to the dissent's position that

there was no evidence supporting the EMED instruction. *Id.* at 154–56, 319 P.3d at 1162–64.

If there was no evidence to support an EMED defense, then the prior conviction should not have been admissible to rebut a non-existent defense. If the prior conviction was admissible because there was sufficient evidence raising the EMED defense, then the defense should not be permitted to manipulate the process by adducing evidence of EMED in the first instance and then waiving the EMED instruction in order to force the jury into making an all or nothing decision.

24. Although the circuit court engaged Adviento in a colloquy regarding his waiver of the EMED defense, the prosecutor questioned whether Adviento needed more time to think about the matter. Despite Adviento's responses to the colloquy, in which he indicated that he understood that he was waiving the EMED defense, when the court asked whether he needed more time to think about the waiver, he responded affirmatively and also explained, "I wasn't expecting this."

25. The dissent contends that the defendant's ability to waive an EMED defense in a bench trial does not result in untrue verdicts because judges in bench trials "routinely receive incompetent evidence or evidence that is admissible for only a limited purpose," or "have knowledge of statutory violations, other than those with which the defendant was charged," and are precluded from considering such evidence or facts in rendering a verdict. Dissent at 162, 319 P.3d at 1170.

However, the court's consideration of an EMED defense that is raised by the evidence is

ilarly, a defendant should not be permitted to keep the jury from considering the EMED defense by waiving a jury instruction.

A requirement that a trial court is to instruct the jury on the EMED defense when it is raised by the evidence, notwithstanding a defendant's stated intention to force the jury to make an "all or nothing" decision, eliminates unnecessary complications and insures that trial courts fulfill their ultimate obligation to properly instruct the jury on the applicable law and that juries satisfy their correlative duty to render "true verdicts" based on the evidence that is presented at trial. *Haanio*, 94 Hawai'i at 415, 16 P.3d at 256.

### C.

The State's arguments against requiring the EMED instruction when the defense is raised by the evidence and in favor of permitting the defendant's waiver of the EMED defense essentially involves two related contentions: 1) that jury instructions on lesser-included offenses are distinct from instructions on the EMED defense, such that the latter type of instructions may be waived at the option of the defendant; and 2) that requiring jury instructions when the evidence raises the EMED defense will confuse the jury or harm the defendant's ability to control his or her trial strategy. Both contentions are without merit.

### 1.

First, the State argues that the *Haanio* rationale for requiring the trial court to in-struct the jury on lesser-included offenses is inapplicable to the facts of this case because "[t]his case involves [the] distinctly different question ... [of] whether a trial court must include an instruction on a <u>defense</u> that the defendant has personally waived and upon which the defendant indicates he or she would not rely."

However, the State's suggestion that the *Haanio* rationale for requiring jury instructions should be disregarded due to the distinction between lesser-included offenses and the EMED defense misapprehends the distinct nature of the EMED defense. "[EMED] [m]anslaughter is not a true defense within the meaning of the Hawai'i Penal Code." *State v. Miyahira*, 6 Haw.App. 320, 322 n. 1, 721 P.2d 718, 720 n. 1 (1986), *overruled on other grounds by Pinero*, 70 Haw. 509, 778 P.2d 704.[26] As stated, "[EMED] is really a mitigating factor. <u>Intentionally killing while under the influence of extreme emotional disturbance does not present a true 'defense,'</u> for the punishment is merely reduced through the mechanism of denominating the crime as 'manslaughter' rather than 'murder'." *Dumlao*, 6 Haw.App. at 175 n. 2, 715 P.2d at 825 n. 2 (emphasis added). *Cf. State v. Faulkner*, 301 Md. 482, 483 A.2d 759 (1984) (distinguishing between self-defense, a "complete defense to either murder or manslaughter" that "results in the acquittal of the defendant," and imperfect self defense, which "is not a complete defense" and "does not completely exonerate the defendant, but mitigates murder to voluntary manslaughter"); *People v. Anderson*,

---

quite different from the court's unavoidable knowledge of facts such as inadmissible evidence or uncharged offenses. In the latter situation, the court is barred by the law from considering such evidence or offenses, and it is presumed that the court follows such law. In a situation where the EMED defense is raised by the evidence, pursuant to our case law, the court is <u>required by the law</u> to consider the EMED defense in determining the defendant's penal liability, and it is the defendant's attempted waiver of such consideration that is contrary to our precedent. Thus, in a bench trial where the defendant is permitted to waive the court's consideration of the EMED defense that is validly raised by the evidence, the court's decision would result in an untrue verdict.

Furthermore, preventing the defendant from waiving an EMED defense that is raised by the evidence does not result in the court asserting a defense on behalf of the defendant. Jury instructions are given based on the facts and the applicable law. *State v. Locquiao*, 100 Hawai'i 195, 205, 58 P.3d 1242, 1252 (2002). Conforming to that mandate does not result in the court asserting a defense on behalf of the defendant.

26. The *Pinero* court overruled *Miyahira* to the extent that the case was inconsistent with its holding that the trial court erred by combining the jury instruction on the lesser-included offense of reckless manslaughter and the EMED defense and "fail[ing] to fully explain the significance" of the EMED defense. 70 Haw. at 524–25, 525 n. 9, 778 P.2d at 714–15, 715 n. 9.

233 Cal.App.3d 1646, 285 Cal.Rptr. 523, 534 (1991) (recognizing "critical distinction between a factor in mitigation which negates malice, thereby resulting in conviction of a lesser crime, and a complete defense negating intent which would result in acquittal"). The mitigating EMED defense is analogous to the mitigating defense of mutual affray addressed in *Kikuta*, in which the court held that a jury instruction on the mitigating defense of mutual affray "must be given along with an instruction on Assault in the Third Degree ... if there is any evidence" supporting the instruction. 125 Hawai'i at 81, 253 P.3d at 642.

Because a successful EMED defense results in conviction for the offense of manslaughter, the outcome is similar to a conviction for a lesser-included offense. Additionally, this court's plain error review of a trial court's failure to give the EMED instruction indicates that the court has treated the EMED defense similar to a lesser included offense in determining whether there was the requisite amount of evidence to support the instruction. *See Sawyer*, 88 Hawai'i 325, 966 P.2d 637; *Moore*, 82 Hawai'i 202, 921 P.2d 122; *Pinero*, 70 Haw. 509, 778 P.2d 704; *Aganon*, 97 Hawai'i 299, 36 P.3d 1269.

The unique nature of the mitigating defense as opposed to a "true defense" warrants the application of the *Haanio* rationale for requiring jury instructions based on the evidence rather than pursuant to the parties' strategic decisions.[27] In order to insure that the trial court fulfills its ultimate obligation to properly instruct the jury on the law and the jury meets its duty to "render true verdicts based on the facts presented," the trial court is required to instruct the jury on the EMED defense notwithstanding a defendant's "waiver." 94 Hawai'i at 414, 16 P.3d at 255.

2.

Second, the State argues that requiring the trial court to instruct the jury on the EMED defense even when it is raised by the evidence is harmful to the defendant's right to control trial strategy and would additionally be confusing to the jury. *Haanio* addressed and rejected the notion that the defense or prosecution is entitled to forgo an instruction for strategic reasons.

Nevertheless, in support of its argument, the State cites *State v. Cabagbag*, 127 Hawai'i 302, 277 P.3d 1027 (2012), in which the court held that juries are required to be instructed on the reliability of eye witness identifications whenever such instruction was requested by the defendant. The court declined to require the instruction where the defendant did not request it, reasoning that "a defendant may legitimately conclude, as a matter of trial strategy, that the instruction is not

---

**27.** The dissent argues that while "the trial court's duty to instruct on lesser included offenses outweighs any interest the defendant might have in waiving such an instruction, the balancing of these interests is fundamentally different for jury instructions regarding defenses" because trial courts are statutorily mandated to instruct the jury on lesser included offenses but not on defenses. Dissent at 159, 319 P.3d at 1167.

HRS § 701–109(5) governing lesser included offenses provides that the "court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." The statute does <u>not</u> mandate, or address, giving the instruction when it is not requested by either the prosecution or defense. In *Kupau*, which interpreted the same statute as *Haanio*, the court did not require instructions on lesser-included offenses, but instead gave the trial court discretion to determine whether the instruction should be given when the prosecution did not request the instruction and the defense specifically objected to the instruction for tactical reasons. 76 Hawai'i at 395–96, 879 P.2d at 500–01.

As stated, *Haanio* overruled *Kupau* and held that trial courts must instruct juries on included offenses when there is a rational basis in the evidence supporting the instruction, "despite any objection by the defense, and even in the absence of a request from the prosecution." 94 Hawai'i at 414, 16 P.3d at 255. The *Haanio* court did not justify its decision based on the language of HRS § 701–109(5). Rather, the critical basis for the decision was the recognition that "trial courts, not the parties, have the duty and ultimate responsibility to insure that juries are properly instructed on issues of criminal liability." 94 Hawai'i at 415, 16 P.3d at 256. Accordingly, the language of HRS § 701–109 as compared to HRS § 707–702(2) is not relevant to our analysis.

necessary or appropriate in a given case." [28] 127 Hawai'i at 315–16, 277 P.3d at 1040–41.

The *Cabagbag* court, however, expressly stated that the jury instruction on eyewitness identification "is different from other jury instructions that this court has held trial courts are required to give sua sponte when there is support in the record," because the identification instruction "does not articulate a type of defense." *Id.* at 315 n. 23, 277 P.3d at 1040 n. 23. The court declined to apply the *Haanio* principles in that case because "the absence of an eyewitness jury instruction does not result in an 'all or nothing' approach" between conviction and acquittal.[29] *Id.* at 315 n. 24, 277 P.3d at 1040 n. 24. In this case, on the other hand, the EMED instruction does articulate a mitigating defense, and the absence of a jury instruction on the EMED defense does result in an "all or nothing" approach that may force the jury to choose between convicting the defendant for murder or attempted murder or acquitting the defendant altogether, despite evidence that could lead the jury to conclude that the defendant acted under the influence of EMED.

The State also argues that the *Pinero* court expressly limited the trial court's duty to instruct the jury on every defense having any support in the evidence to situations where the instruction was requested. However, the *Pinero* court's holding was that "self-defense instructions requested by the prosecution should be given unless the defendant objects to the giving of the instructions on the basis that the record does not reflect any evidence on [the] issue and the trial court agrees with the defendant[.]" 75 Haw. at 304–05, 859 P.2d at 1380. This is consistent with requiring the trial court to instruct the jury on the EMED defense only when it

is raised by the evidence, as established by the court in *Sawyer, Warner,* and *Moore.*

Additionally, the *Pinero* court specifically stated that it "need not reach the issue of whether a trial court is required to provide self-defense instructions, sua sponte, whenever supported by the evidence." 75 Haw. at 305 n. 13, 859 P.2d at 1380 n. 13. Subsequently, in *Kikuta,* a case involving a mitigating defense, this court held that the trial court must sua sponte instruct the jury on the mitigating defense of mutual affray "where there is any evidence in the record" that the defense applied. 125 Hawai'i at 96, 253 P.3d at 657.

The State also cites this court's decision in *State v. Taylor,* 130 Hawai'i 196, 307 P.3d 1142 (2013) in support of its argument that the circuit court did not err by not instructing the jury on the EMED defense. However, this court's decision in *Taylor* is consistent with the requirement that the trial court must sua sponte instruct the jury on the affirmative, mitigating EMED defense whenever it is sufficiently raised by the evidence. In *Taylor,* the court held that "in the case of an unrequested mistake of fact jury instruction denominated as error for the first time on appeal," "the defendant must have come forward at trial with credible evidence of facts constituting the defense, unless those facts were supplied by the prosecution's witnesses." *Id.* at 207, 307 P.3d at 1153.

The mistake of fact defense addressed in *Taylor* is defined by HRS § 702–218 as follows:

> In any prosecution for an offense, it is a defense that the accused engaged in the prohibited conduct under ignorance or mistake of fact if: (1) <u>The ignorance or mistake negatives the state of mind required to establish an element of the offense;</u> or (2) The law defining the offense or a law

---

28. The dissent to Part II of *Cabagbag* stated that eyewitness jury instructions should be required "whenever eyewitness identification testimony is critical to the case," even in the absence of a request by a defendant. 127 Hawai'i at 319, 277 P.3d at 1044 (Acoba, J., dissenting).

The dissent stated that the cautionary instruction on eyewitness identification "is one of those instances ... in which the public interest in ensuring fair outcomes outweighs the interest of any particular defendant in obtaining a tactical

advantage at trial." *Id.* at 320, 277 P.3d at 1045 (Acoba, J., dissenting).

29. The dissent stated that the cautionary instruction on eyewitness identification "is one of those instances ... in which the public interest in ensuring fair outcomes outweighs the interest of any particular defendant in obtaining a tactical advantage at trial." *Id.* at 320, 277 P.3d at 1045 (Acoba, J., dissenting).

related thereto provides that the state of mind established by such ignorance or mistake constitutes a defense.

(Emphasis added).

■ The mistake of fact defense, which is a non-affirmative defense, *see* HRS § 701–115(3), is based upon the defendant's ignorance or mistake that "is capable of negativing the state of mind required to establish an element of the offense." *Taylor*, 130 Hawai‘i at 207, 307 P.3d at 1153 (quotation marks and brackets omitted). However, pursuant to HRS § 704–114(1)(b), the State is already required to prove "[t]he state of mind required to establish each element of the offense" beyond a reasonable doubt.

Accordingly, to the extent that a mistake of fact instruction may overlap with the court's general instruction on the State's burden in proving the requisite state of mind of an offense, there is certainly a concern that "weak, inconclusive, or unsatisfactory evidence" of the mistake of fact defense would not always be " 'apparent' to the trial court in a bench or jury trial" if the defendant does not request an instruction on the defense. *See Taylor*, 130 Hawai‘i at 207 n. 12, 307 P.3d at 1153 n. 12 ("Absent such a request, due to its nature, weak, inconclusive, or unsatisfactory evidence relevant to an unstated defense may not necessarily take on any apparent significance during trial.").

■ On the contrary, the EMED defense is an affirmative, <u>mitigating</u> defense that is specific to prosecutions for murder or attempted murder. HRS § 707–702(2). In such prosecutions, EMED is far from "some nebulous, barely glimpsed theory on the margins." *See Stenger*, 122 Hawai‘i at 297, 226 P.3d at 467 (Kim, J., concurring) (the fear that requiring a mistake of fact instruction in *Stenger* would thereafter burden trial courts with responsibility "for combing through the entire body of evidence in search of every possible defense theory," was unwarranted,

as "the theory at issue formed the very heart of the defense case, rather than some nebulous, barely glimpsed theory on the margins"). Rather, trial courts in all murder and attempted murder prosecutions would be aware of the potential of an EMED defense and would therefore not be burdened with remaining constantly vigilant for an obscure or marginal theory of defense.

■ Additionally, the EMED defense does not negate the state of mind required to establish murder or attempted murder; rather, the defense, if proven, mitigates the offense from murder to manslaughter. Thus, even absent a request for the EMED instruction, there is almost no likelihood that the trial court would overlook the EMED defense on the basis that the court's general instructions regarding the State's burden of proof upon an offense would be sufficient to address the EMED defense.

Moreover, in a situation where the defendant is attempting to <u>waive</u> the EMED defense, the trial court's attention would unquestionably be drawn to the applicability of the defense and the evidence supporting the defense.[30] Thus, the *Taylor* decision and the distinction made between requested and unrequested instructions in that case is not applicable here.

3.

Finally, the State argues that "foisting an EMED defense on [Adviento] could have prejudiced him by compromising the credibility of his chosen defense of self-defense, inasmuch as the defenses are not necessarily complimentary [sic]."

■ However, the EMED defense is not inherently contradictory with a theory of self-defense. It is not difficult to conceive of a situation in which "elements of manslaughter are present to at least some degree in cases where self-defense is [also] reflected in the evidence." *State v. Warner*, 58 Haw.

**30.** The dissent makes the following assertion: "The majority contends that the holding in *Taylor* is not applicable here because *Taylor* concerned a non-affirmative complete defense whereas this case concerns an affirmative defense." Dissent at 157, 319 P.3d at 1165. We do not make this contention, and we do not hold

that *Taylor* applies only to a non-affirmative complete defense. Instead, unlike the circumstances in *Taylor*, the EMED instruction in this case was brought to the attention of the court, and the judge specifically found sufficient evidence to support the giving of the instruction to the jury.

492, 498–99, 573 P.2d 959, 963 (1977), overruled on other grounds by *Sawyer*, 88 Hawai'i 325, 966 P.2d 637.[31] "Simply put, actions taken in self-defense may indeed be committed while the defendant is subject to a certain degree of terror, resentment, rage or anger which in turn may be of sufficient magnitude to constitute the 'extreme mental or emotional disturbance' which would reduce murder to manslaughter." *Warner*, 58 Haw. at 498–99, 573 P.2d at 963 (footnote omitted).

Moreover, this court has recognized that the "applicable test" for giving jury instructions "is one of a presence or an absence of evidentiary support for a defense, not one of a consistency of defenses." *State v. Lira*, 70 Haw. 23, 29, 759 P.2d 869, 873 (1988). *See State v. Irvin*, 53 Haw. 119, 120, 488 P.2d 327, 328 (1971) (trial court's refusal to give self defense instruction was reversible error where defendant's testimony "fairly raised the issue of self defense," even though "[d]efendant's theory at the trial was that the killing was accidental, not that it was done in self defense").

Consistent with this recognition, this court has expressly rejected the argument that the defendant's reliance on a theory of self-defense constitutes a bar to the presentation of the EMED defense to the jury.[32] *Warner*, 58 Haw. at 498–99, 573 P.2d at 963. In *Warner*, the defendant was found guilty of murder[33] for an incident in which he shot the decedent at close range with a revolver. *Id.*

at 493, 573 P.2d at 960. The defendant and the decedent had been friends at one point, but "considerable friction" arose after they both became romantically involved with the same woman. *Id.* at 493–94, 573 P.2d at 960–61. Although the defendant maintained that he shot the victim in self-defense, "he also testified that he felt 'frustrated' and 'was under a lot of strain and a lot of stress' at the time of the shooting." *Id.* at 493, 573 P.2d at 960. He testified that his strain "stemmed in part from his concern over finding another place to live, as well as the manner in which he, [the decedent, and the woman] had been quarrelling[.]" *Id.* at 495, 573 P.2d at 961. At the same time, defendant on cross-examination "denied having been angry or upset with [the decedent] when he shot him," *id.* at 498, 573 P.2d at 963, and testified that prior to the shooting, the decedent confronted and threatened him, then came towards him and "started to swing" at him. *Id.* at 494–95, 573 P.2d at 961. The defendant testified that he "panicked" and shot the decedent. *Id.* at 495, 573 P.2d at 971.

The court held that the defendant's testimony raised the issue of whether he had been under the influence of EMED at the time he shot the decedent and that the trial court was therefore bound to give the defendant's requested instructions on EMED manslaughter. *Id.* at 497–99, 573 P.2d at 963. The court found that "while it is true that [defendant] relied mainly on a theory of self-defense at trial, this constituted no bar

31. In *Warner*, the court held that subject to a very limited exception, "in all murder prosecutions ... where the evidence necessitates an instruction on self-defense, the trial court shall also give instructions to the jury on the charge of manslaughter," regardless of whether the defendant requested such instructions. *Id.* at 500, 573 P.2d at 964. The court in *Sawyer* overruled this blanket rule and held that "justice demands a case-by-case analysis." 88 Hawai'i at 333–34, 966 P.2d at 645–46.

32. Our decision in *State v. Metcalfe*, 129 Hawai'i 206, 297 P.3d 1062 (2013) is not inconsistent with this position. In *Metcalfe*, the court held that the circuit court did not plainly err in failing to sua sponte instruct the jury on the defense of property "because there was no evidence that the charged offense was committed to defend Metcalfe's property." *Id.* at 234, 297 P.3d at 1090 (emphasis added). Because the record was de-

void of any evidence supporting the defense, "a defense of property instruction would have been contrary to the defense's theory of the case, i.e. that Metcalfe fired the shotgun at [the victim] in self-defense[,]" and "inclusion of a defense of property instruction ... could have misled or confused the jury[.]" *Id.*

Clearly, if no evidence is presented during trial supporting a defense, then an instruction on the defense should not be presented to the jury. The trial court is only obligated to instruct the jury on the EMED defense if the defense is raised by the evidence.

33. When the *Warner* case was decided in 1977, there were no degrees of murder in Hawai'i. 58 Haw. at 493 n. 1, 573 P.2d at 960 n. 1. The offense of murder was defined as intentionally or knowingly causing the death of another person. *Id.*

to the presentation to the jury of instructions on the theory of manslaughter." *Id.* at 498–99, 573 P.2d at 963. The court continued, "So long as the testimony fairly raises the issue of manslaughter, it is irrelevant that that issue was not explicitly offered as a defense theory during the trial." *Id.* at 499, 573 P.2d at 963. The court held that the trial court erred in refusing to give the defendant's requested instructions on EMED and reversed and remanded for a new trial. *Id.* at 493, 573 P.2d at 960.

Thus, the defendant's reliance on a theory of self-defense does not affect the trial court's obligation to instruct the jury on the EMED defense when it is raised by the evidence.

Furthermore, requiring the trial court to instruct the jury on the EMED defense when it is raised by the evidence does not detract from the defendant's ability to advocate a particular theory of defense. Defense counsel, for example, has exclusive discretion to determine whether to argue the EMED defense during closing argument. Jury instructions are issued by the court; they are the court's instructions on the law rather than instructions of the State or the prosecution.[34] Thus, the State's suggestion that an EMED instruction would prejudice the defendant by compromising the credibility of his theory of defense is based on a fundamentally erroneous premise that confuses trial strategy with the court's duty to the jury.

Thus, the trial court has a duty to instruct the jury on the defense of EMED if the record reflects "<u>any</u> evidence" supporting the defense, notwithstanding the defendant's trial strategy or theory of the case.

### 3.

■ In this case, it is clear that the evidence raised the issue of whether Adviento acted under the influence of EMED.

■ As stated, EMED "reduces the offense to manslaughter or attempted manslaughter," if "the defendant was, at the time

the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation." HRS § 707–702(2). The trial court is obligated to provide an EMED instruction if the "record reflects *any* evidence of a subjective nature that the defendant acted under a loss of self-control resulting from [EMED]." *Aganon,* 97 Hawai'i at 304, 36 P.3d at 1274. The court views "the evidence ... in a light most favorable to the appellant in determining whether or not the instruction should [have been] given." *State v. O'Daniel,* 62 Haw. 518, 528, 616 P.2d 1383, 1390–91 (1980).

■ A defendant asserting the EMED defense is not required to "show he or she has been exposed to 'an extremely unusual and overwhelming stress.'" *State v. Seguritan,* 70 Haw. 173, 174, 766 P.2d 128, 129 (1988). "On the contrary, the statute focuses ... on the <u>defendant's reaction to the stress,</u> and requires only that the defendant be under the influence of extreme mental or emotional disturbance for which there is 'a reasonable explanation.'" *Id.* (emphasis added). "The disturbance was meant to be understood in relative terms as referring to a loss of self-control due to intense feelings." *State v. Matias,* 74 Haw. 197, 205, 840 P.2d 374, 378 (1992) (quoting *Dumlao,* 6 Haw.App. at 180, 715 P.2d at 828).

In *Warner,* the court applied the "any evidence" standard and held that the trial court erred in refusing to give the defendant's requested EMED instruction, where there was evidence that "considerable friction" had developed between the defendant and the decedent after they both became romantically involved with the same woman, and the defendant "testified that he felt 'frustrated' and 'was under a lot of strain and a lot of stress' at the time of the shooting." 58 Haw. at 493–94, 573 P.2d at 960–61. Additionally, the defendant testified that the three parties had several arguments on the night of the shooting, the decedent refused to permit him to take his belongings out of the

---

**34.** *See* HAWJIC 1.01 (2009) ("As the judge in this case, I have three main duties: ... (3) I will instruct you on the law that you must apply in this case."); HAWJIC 3.01 (2009) ("I will now

instruct you on the law that you must follow in reaching your verdict"); HRE Rule 1102 (1980) ("The court shall instruct the jury regarding the law applicable to the facts of the case[.]").

shared apartment, and that at the moment he shot the decedent, his "thoughts went to why, after all the financial support" he had given the other parties, "they would do this to me" and prevent him from taking his belongings. *Id.* at 493–95, 573 P.2d at 960–61. The *Warner* court considered this testimony and found that it "depict[ed] the circumstances which may have contributed to a disturbed state of mind on the part of [the defendant]." *Id.* at 498, 573 P.2d at 963.

In this case, the evidence indicates that Adviento may have been under significant strain and stress at the time he caused Erlinda's death, particularly due to the problems he and Erlinda were experiencing. The evidence showed that Erlinda had a close relationship with her co-worker, Merced and that Erlinda was actively seeking a divorce from Adviento. Adviento testified that he thought Erlinda may have been "fooling around." Three weeks prior to Erlinda's death, Erlinda accused Adviento of "having an affair and womanizing in the Philippines."

On the day of Erlinda's death, Adviento testified that he overheard Erlinda speaking on the phone and saying, "[S]weetheart, will it be okay if I don't have any present to you?" Adviento testified that he felt "[f]rustrated" when he heard this. Adviento told Erlinda, "you told me that I was the one making relationship in the Philippines, while the truth is you were the one having a boyfriend here." Adviento testified that he and Erlinda began "arguing back and forth," that he was mad, and Erlinda was also "very mad."

Adviento's testimony that he and Erlinda were arguing prior to her death was corroborated by Merced and Officer Sooto. Merced testified that he was talking to Erlinda on the phone when they were interrupted by "someone's banging the door." He heard Adviento accuse Erlinda of having a boyfriend. Merced told police that Adviento was "screaming mad." In addition, Officer Sooto testified that when he responded to Villaver's 911 call and arrived at the Adviento residence, Villaver told him that "there was an argument going on for several hours" prior to her call.[35]

Finally, Adviento testified as to his state of mind when he stabbed Erlinda. He testified that he was "surprised" after Erlinda first stabbed him in the stomach. When he began stabbing Erlinda, he described his mindset as, "I was afraid of my life. I thought I was going to die. I got plenty blood." He said that he kept stabbing her, "I don't know how many times. I don't know where.... I just kind of afraid that I would die." After Erlinda stopped moving, Adviento testified that he stood up and looked at her, not knowing "if she's unconscious or if she's dead." He testified to feeling "shocked."

The medical examiner also testified that excluding the defensive wounds Erlinda sustained on her hands, Erlinda had a total of seventeen wounds on her body, including sixteen stab wounds.

Thus, similar to *Warner*, there was testimony of the "circumstances which may have contributed to a disturbed state of mind," including a strained relationship and an argument precipitating the incident.

This case is distinguished from cases in which the court has held that an EMED instruction is not warranted where there was no evidence of the defendant's subjective loss of self-control during the alleged crime. *See Aganon,* 97 Hawai'i at 304, 36 P.3d at 1274 (in murder prosecution, defendant provided only "generalized testimony that she sometimes loses her temper in stressful situations" and "did not testify that she was acting under any mental or emotional disturbance with respect to the offense in question"); *Moore,* 82 Hawai'i at 210–11, 921 P.2d at 130–31 (police officers testified that defendant was "agitated" and "nervous" at the time of his arrest, but there was no evidence of the defendant's "internal situation" at the time he shot the complainant because neither the complainant nor the defendant testified, and they were the "[o]nly two people [who] had any knowledge of [the defendant's] state of mind at the time he fired the shots").

In this case, both Adviento and Merced testified to Adviento's "internal situation,"

---

35. Villaver denied making this statement to Officer Sooto. *See supra* note

*Moore,* 82 Hawai'i at 210–11, 921 P.2d at 130–31, just prior to and during the incident. Thus, considered in its entirety and in a light most favorable to Adviento, the evidence clearly satisfied the "any evidence" standard and warranted an EMED instruction. The circuit court reached the same conclusion and informed Adviento that he would, if requested, instruct the jury on the EMED defense ("Let me just tell you that I would, if requested, instruct the jury on [EMED] in this case").

"It was the jury's province to determine the weight and credibility" of any evidence supporting Adviento's EMED defense. *Dumlao,* 6 Haw.App. at 186, 715 P.2d at 832. *See State v. Kinnane,* 79 Hawai'i 46, 52, 54, 897 P.2d 973, 979, 981 (1995) (jury could rationally have believed the complainant's testimony in its entirety or in part). The trial court's duty is to give the EMED instruction if there is "any evidence" supporting the instruction.

Given that the evidence sufficiently raised the issue of EMED, the circuit court was required to instruct the jury on the defense notwithstanding that a "waiver" of the instruction was elicited from Adviento.[36] Thus, the circuit court's failure to instruct the jury on the EMED defense constituted plain error. *See Sawyer,* 88 Hawai'i at 333, 966 P.2d at 645; *Moore,* 82 Hawai'i at 209–10, 921 P.2d at 129–30; *Aganon,* 97 Hawai'i at 302, 36 P.3d at 1272. Adviento's conviction must be vacated inasmuch as there is a reasonable possibility that the error contributed to his conviction.[37] *See Kikuta,* 125 Hawai'i at 97,

253 P.3d at 658 ("Inasmuch as it is the duty of the trial court to properly instruct the jury, the judgment of conviction must be vacated ... because there is a reasonable possibility that the error contributed to [the] conviction.").

## IV.

Based on the foregoing, we vacate the ICA's Judgment on Appeal and the circuit court's Judgment, and remand the case for a new trial consistent with this opinion.

## Concurring Opinion by ACOBA, J.

I agree with the holding and core rationale of the majority opinion in this case, that the circuit court of the first circuit (the court) had the duty and obligation to instruct the jury on the mitigating defense of Extreme Mental and Emotional Distress (EMED) manslaughter to a charge of murder, because our cases and the public interest mandate accurate and true verdicts based on the law and the evidence. Such verdicts cannot be attained insofar as trial strategies based on a "win-lose", or an "all or nothing" approach are allowed to govern. *State v. Haanio,* 94 Hawai'i 405, 415, 16 P.3d 246, 256 (2001) ("Acceding to an 'all or nothing' strategy ... forecloses the determination of criminal liability where it may in fact exist."). That approach would pose a substantial risk of a jury returning a verdict that is not reflective of the facts and of the relevant law. *See State v. Flores,* 131 Hawai'i 43, 57, 314 P.3d 120, 134 (2013) (explaining that holding the

---

**36.** Our holding is limited in application to the EMED defense under HRS § 707–702(2).

**37.** In light of our disposition on this issue, we need not address the remaining question of whether the ICA gravely erred in holding that Adviento was not entitled to any relief based on the manner in which the circuit court handled the issue of the admissibility of his prior assault conviction. Accordingly, we need not decide whether the circuit court actually ruled on the admissibility of the prior conviction or caused Adviento to forgo the EMED instruction in order to prevent the prior conviction from being admitted.

We note however that during the in limine hearing the State indicated that it intended to introduce evidence of the prior assault conviction

through the testimony of the fingerprint examiner. The ICA indicated its belief that the circuit court would not have admitted the prior conviction if Adviento sought to raise an EMED defense based on the theory that "he was shocked by his wife's attempt to kill him when he was confronting her about 'her lies and her affair.'" 2012 WL 2864226, at *12.

In a situation where evidence of the defendant's prior conviction (as opposed to evidence of the underlying act) is admitted, it has been suggested that the proper course is for the State on cross-examination to "elicit[ ] the name of the crime, the date, place, and fact of the conviction[.]" ADDISON M. BOWMAN, HAWAII RULES OF EVIDENCE MANUAL 6–46 (2012–2013 ed.). If the witness admits the conviction, then "impeachment is complete and extrinsic evidence is redundant and unnecessary." *Id.* 6.

lack of a lesser included offense instruction to be harmless error "perpetuates the risk that the jury in any given case did not actually reach the result that best conforms with the facts[.]").

However, I write to concur because there are several propositions described in the majority opinion herein that I have said must be or should be augmented. First, in *State v. Cabagbag*, 127 Hawai'i 302, 277 P.3d 1027 (2012), the majority there, in requiring a defendant to request an eyewitness identification instruction before it may be given, distinguished *Haanio* on the grounds that the identification instruction is not a defense and did not constitute an "all or nothing" approach. *Cabagbag*, 127 Hawai'i at 315 n. 23, 277 P.3d at 1040 n. 23. However, if it were not "a type of defense," there seems little reason for the *Cabagbag* majority to condition the giving of the instruction on the defendant's request. *See id.*

The fact is that for all intents and purposes the identification instruction is intended to protect defendants because " '[t]he empirical evidence demonstrates that eyewitness misidentification is the single greatest cause of wrongful convictions in this country.' " *Cabagbag*, 127 Hawai'i at 320, 277 P.3d at 1045 (quoting *Perry v. New Hampshire*, —— U.S. ——, 132 S.Ct. 716, 732, 181 L.Ed.2d 694 (2011) (Sotomayor, J., dissenting)). The *Cabagbag* majority's position rested "on the ground that defendants may wish to forgo the instruction as a matter of strategy[.]" *Cabagbag*, 127 Hawai'i at 320, 277 P.3d at 1045 (Acoba, J., dissenting). Respectfully, this is the same strategy-bound analysis that in principle was rejected in *Haanio*—that is that "the public interest in ensuring fair outcomes outweighs the interest of any particular defendant in obtaining a tactical advantage at trial." *Id.* "[A]ny party's desire to deflect the jury's attention from identification issues is far outweighed by the need to ensure that juries are properly instructed on eyewitness identification testimony." *Id.* at 320 n. 29, 277 P.3d at 1045 n. 29.

Second, while EMED manslaughter may be raised as a mitigating defense to murder, this case does not present a situation where there is a dispute as to whether a theory of defense, here EMED manslaughter, was apparent and one on which the court could have instructed. On the other hand, any defense, no matter how weak, inconclusive or unsatisfactory the court may believe the evidence is, should be brought to the attention of the jury because it is the jury that finds the facts. *State v. Stenger*, 122 Hawai'i 271, 226 P.3d 441 (2010).

"[T]he principle underlying *Stenger*, and [*State v. Locquiao*, 100 Hawai'i 195, 58 P.3d 1242 (2002),] is that it would be wrong to uphold a defendant's conviction when no instruction was given to the jury on an apparent defense that existed in the evidence, and there is a reasonable possibility that the failure to instruct the jury on that defense contributed to the conviction." *State v. Taylor*, 130 Hawai'i 196, 214, 307 P.3d 1142, 1159 (2013) (Acoba, J., concurring and dissenting) (citing *Locquiao*, 100 Hawai'i at 206, 58 P.3d at 1253). For, "the trial court, trained and experienced in the law and viewing the evidence at trial" should be credited with the competence to "recognize an applicable defense adduced in the evidence[.]" *Taylor*, 130 Hawai'i at 217 n. 15, 307 P.3d at 1163 n. 15 (Acoba, J., concurring and dissenting).

In any event, because it is a fundamental proposition that the jury must be informed of the legal theories presented by the evidence, the determination of whether the court should have given an instruction regarding a defense does not rest on the failure of any particular judge to recognize that defense in the evidence. The ultimate safeguard for insuring the public interest in fully informed jurors rests in appellate review, as in every case where error may have been committed at trial.

Finally, I believe the mitigating defense of EMED manslaughter to a charge of murder should not be circumscribed by a singular focus on loss of self control. Since the EMED manslaughter defense is a mitigating defense to murder, it necessarily concedes that the defendant intentionally or knowingly caused the death of another, but under extreme mental and emotional distress. *See* HRS § 707–701.5. Thus, commission of the acts constituting murder cannot be the basis for defeating the mitigating defense of

EMED manslaughter. *See State v. Haili*, 103 Hawai'i 89, 109, 79 P.3d 1263, 1283 (2003) (Acoba, J., concurring and dissenting) (explaining that " '[s]elf-control' is not an element of the defense of emotional disturbance manslaughter[,]" and that otherwise, "[t]he defense becomes logically meaningless because the question of self-control is obviated by the legal prerequisite finding of intentional or knowing conduct resulting in murder that the fact-finder must make[.]").

Dissenting Opinion by NAKAYAMA, J. with whom RECKTENWALD, C.J., Joins.

I respectfully dissent from the majority's holding that the trial court plainly erred in failing to instruct the jury on the extreme mental and emotional disturbance (EMED) defense because there is no evidence to support the EMED instruction and, regardless, Mr. Adviento waived this instruction.

## I. EMED is an affirmative mitigating defense

EMED is a mitigating defense which can reduce a charge of murder in the first or second degree to a charge of manslaughter. Hawai'i Revised Statutes (HRS) § 707–702(2) (Supp.2008). Manslaughter committed under extreme mental or emotional disturbance is "the intentional [or knowing] killing of another 'while under the influence of a reasonably induced emotional disturbance causing a temporary loss of normal self-control.' " *State v. Aganon*, 97 Hawai'i 299, 304, 36 P.3d 1269, 1274 (2001) (alterations in original) (quoting *State v. Sawyer*, 88 Hawai'i 325, 333, 966 P.2d 637, 645 (1998)). "But for the presence of these extenuating circumstances the intentional or knowing killing of another human being would be murder...." *State v. Holbron*, 80 Hawai'i 27, 42, 904 P.2d 912, 927 (1995).

To warrant an instruction as to the EMED defense, there must be evidence of the defendant's extreme mental or emotional disturbance as well as a "reasonable explanation" for that disturbance. HRS § 707–702(2). "The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be." HRS

§ 707–702(2). We have explained extreme emotional disturbance as:

> "the emotional state of an individual who: (a) has no mental disease or defect that rises to the level established by Section 30.05 of the Penal Law; and (b) is exposed to an extremely unusual and overwhelming stress; and (c) has an extreme emotional reaction to it, as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions."

*State v. Perez*, 90 Hawai'i 65, 73, 976 P.2d 379, 387 (1999) (emphasis omitted) (quoting *State v. Dumlao*, 6 Haw.App. 173, 181–82, 715 P.2d 822, 829 (1986)). We reasoned that " 'a killer's self-control, or lack of it, at the time of the killing is a significant, even determining, factor in deciding whether the killer was under the influence of an extreme emotional disturbance such that his conduct would fall under HRS § 707–702(2).' " *Sawyer*, 88 Hawai'i at 333, 966 P.2d at 645 (quoting *State v. Matias*, 74 Haw. 197, 204, 840 P.2d 374, 378 (1992)).

EMED manslaughter is an affirmative defense. HRS § 707–702(2). Therefore, the defendant bears the burden of proving by a preponderance of the evidence that he or she was acting under the influence of reasonably induced extreme mental or emotional disturbance at the time of the offense. *See* HRS § 701–115(2)(b) (1993) ("If the defense is an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in light of any contrary prosecution evidence, proves by a preponderance of the evidence the specified fact or facts which negative penal liability."). If the jury unanimously determines that the defendant has established the EMED defense by a preponderance of the evidence, the jury must acquit the defendant of murder and convict the defendant of the lesser offense of manslaughter.

HRS § 701–115(1) defines a defense as a " 'fact or set of facts which negatives penal liability.' " The majority implies that because proof of a mitigating defense results in a conviction for a lesser offense, rather than a complete acquittal, a mitigating defense is

not a "true defense." *See* Majority at 144–45, 319 P.3d at 1152–54. The majority's analysis ignores that, when proved, a mitigating defense "negatives penal liability" for the charged offense and results in an acquittal for that offense. That proof of the mitigating defense also results in conviction for a lesser offense does not mean that it is not a defense. Mitigating defenses are "defenses" pursuant to HRS § 701–115(1).

## II. There is no evidence to support the EMED instruction

The majority states that "it is the trial court's obligation to provide an EMED instruction when 'the record reflects <u>any</u> evidence ... that the defendant acted under a loss of self-control resulting from [EMED].' " Majority at 137–38, 319 P.3d at 1145–46 (emphasis in original) (quoting *Aganon*, 97 Hawai'i at 304, 36 P.3d at 1274). Even under this lenient standard, there is no evidence in the record to support the giving of an EMED instruction. Where the record contains no evidence to support an EMED defense, the defendant is not entitled to such an instruction. *Sawyer*, 88 Hawai'i at 331, 966 P.2d at 643.

The majority states that the evidence adduced at trial clearly raises the issue of whether Mr. Adviento acted under the influence of EMED. Majority at 150, 319 P.3d at 1158. The majority first emphasizes evidence of Mr. Adviento's anger preceding the fatal stabbing. Majority at 150–51, 319 P.3d at 1158–59. Citing the allegations regarding Mrs. Adviento's possible romantic relationship with her co-worker Merced, the majority surmises that Mr. Adviento "may have been under significant strain and stress ... due to the problems he and [Mrs. Adviento] were experiencing." Majority at 151, 319 P.3d at 1159. The majority also notes Mr. Adviento's statements that he felt "frustrated" when he heard Mrs. Adviento speaking on the phone and that he was "mad" during his subsequent argument with her. Majority at 151, 319 P.3d at 1159. The majority emphasizes that this lengthy argument and Mr. Adviento's anger were corroborated by Officer Sooto's testimony that Villaver told him the argument went on for several hours and

by Merced's statement that Mr. Adviento was "screaming mad." Majority at 151, 319 P.3d at 1159.

However, the evidence of the Advientos' purported marital difficulties does not rise to the level of "an <u>extremely unusual</u> and <u>overwhelming stress</u>" that would <u>reasonably</u> explain a loss of self-control. *Perez*, 90 Hawai'i at 73, 976 P.2d at 387 (emphasis added). Mr. Adviento testified that he had suspected Mrs. Adviento of "fooling around" for about a year and that Mrs. Adviento had requested a divorce two or three times. Mr. Adviento also stated that he would not be ashamed to be divorced and it would "be okay" if Mrs. Adviento left him. Although Mr. Adviento stated that he felt frustration and anger while arguing with Mrs. Adviento regarding her phone call with Merced, this testimony regarding his emotional reaction falls far short of constituting evidence of a physical loss of self-control.

The majority also cites to Mr. Adviento's testimony regarding his mental state immediately before and during the fatal stabbing of Mrs. Adviento. Majority at 151, 319 P.3d at 1159. Mr. Adviento testified that he was "surprised" that Mrs. Adviento stabbed him in the stomach. Majority at 151, 319 P.3d at 1159. He stated that, while he struggled with Mrs. Adviento, he was "afraid of [his] life" and he "thought [he] was going to die." Majority at 151, 319 P.3d at 1159. Mr. Adviento also testified that he did not know how many times, or where he stabbed Mrs. Adviento. Majority at 151, 319 P.3d at 1159.

Mr. Adviento's testimony regarding his deadly struggle with Mrs. Adviento is similar to the testimony in *Sawyer* from which we concluded that there was no evidence to warrant an EMED manslaughter instruction. In *Sawyer*, we reasoned that there are "situation[s] where a defendant exerts deadly force in self-defense, without a loss of self-control due to the influence of extreme mental or emotional disturbance." 88 Hawai'i at 333, 966 P.2d at 645.

The altercation in *Sawyer* occurred between two women living in Kapiolani Park. *Id.* at 327, 966 P.2d at 639. The complaining witness (CW) testified that she had accused

defendant Sawyer of stealing CW's mother's food stamps and that Sawyer had then hit CW with a vodka bottle. *Id.* An altercation ensued during which the women punched each other and CW was cut by the, then broken, vodka bottle. *Id.* Sawyer testified that it was CW who threw the first punch. *Id.* at 328, 966 P.2d at 640. She stated that the vodka bottle broke during the ensuing fight, and that she used the broken bottle to push CW away, inadvertently cutting CW in the process. *Id.* When the police arrived on the scene, CW was bleeding heavily from wounds to her face, neck, and head. *Id.* at 327, 966 P.2d at 639.

As in *Sawyer*, Mr. Adviento testified that he was involved in a potentially deadly fight. Both Sawyer and Mr. Adviento testified that they were not fully aware of the results of their actions during the fight. *Compare* Majority at 151, 319 P.3d at 1159 (stating that Mr. Adviento did not know where and how many times he stabbed Mrs. Adviento), *and Sawyer*, 88 Hawai'i at 328, 966 P.2d at 640 (stating that Sawyer did not realize that she was cutting CW). Although Mr. Adviento testified that he was surprised and afraid, none of his testimony indicated that he lost self-control. Without evidence of a loss of self-control, an EMED instruction is not warranted.

Finally, the majority references Mr. Adviento's testimony regarding his state of mind following the stabbing. Mr. Adviento stated that after Mrs. Adviento stopped moving he felt "shocked." Majority at 151–52, 319 P.3d at 1159–60. This testimony is irrelevant. Only evidence of Mr. Adviento's state of mind at the time of the altercation is pertinent to the EMED defense. In *State v. Moore*, 82 Hawai'i 202, 921 P.2d 122 (1996), we concluded that evidence that the defendant was "agitated," "nervous," "frantic," "anxious," and "distraught" at the time of his arrest, immediately following the shooting of his wife, was not probative of his state of mind at the time of the shooting. 82 Hawai'i at 210, 921 P.2d at 130. We concluded that "even if this evidence supported a conclusion that [the defendant] was under the influence of an EMED when he was arrested, the relevant inquiry is whether he was under

such influence at the time he shot [his wife] and whether there was a reasonable explanation, viewed from [the defendant's] standpoint, for the disturbance." *Id.* Likewise, Mr. Adviento's "shock" upon realizing that his wife was dead, is not evidence of his state of mind at the time of the altercation.

The strain in the Advientos' relationship, Mr. Adviento's purported "surprise" at Mrs. Adviento's attack, and Mr. Adviento's emotional reactions subsequent to Mrs. Adviento's death are not evidence of a loss of self-control. Therefore, there is no evidence to support an EMED instruction.

### III. An unrequested jury instruction regarding a defense is not subject to the "any" evidence standard

The majority's "any evidence" standard directly contradicts the test for unrequested jury instructions this court recently developed in *State v. Taylor*, 130 Hawai'i 196, 307 P.3d 1142 (2013). The *Taylor* test provides that the appellate court must first review unrequested defense instructions for plain error affecting substantial rights. *Id.* at 197–98, 307 P.3d at 1143–44. "[P]lain error exists if the defendant, at trial, had met his or her initial burden to adduce credible evidence of facts constituting the defense (unless those facts are supplied by the prosecution's witness)." *Id.* at 198, 307 P.3d at 1144. Credible evidence is "evidence with reasonable grounds for being believed." *Id.* at 205 n. 10, 307 P.3d at 1151 n. 10. Even if the trial court plainly erred in omitting a jury instruction, this is grounds for reversal only "if an examination of the record as a whole reveals that the error was not harmless beyond a reasonable doubt." *Id.* at 208, 307 P.3d at 1154.

In our opinion in *Taylor*, we first clarified our earlier holding in *State v. Stenger*, 122 Hawai'i 271, 226 P.3d 441 (2010), another case involving a mistake of fact jury instruction. *Id.* at 203, 307 P.3d at 1149. We stated that in *Stenger*, the trial court had a duty to provide the defense instruction because the defendant had requested it and had provided some evidence in support of the defense. *Id.* We reached this conclusion by applying our standard for requested jury

instructions from *Locquiao*, 100 Hawai'i 195, 58 P.3d 1242 (2002). *Id.* at 202–03, 307 P.3d at 1148–49. In *Locquiao*, we held that "'where a defendant has adduced evidence at trial supporting an instruction on the statutory defense of ignorance or mistake of fact, the trial court must, at the defendant's request, separately instruct as to the defense ... no matter how weak, inconclusive, or unsatisfactory the evidence [as to the defendant's mistake of fact] may be.'" *Id.* at 202, 307 P.3d at 1148 (alterations in original) (quoting *Stenger*, 122 Hawai'i at 281, 226 P.3d at 451).

Pursuant to *Locquiao*, *Stenger*, and *Taylor*, the trial court is obligated to give a requested jury instruction on a defense when "some evidence" in support of the defense is proffered. However, a trial court is only required to give an unrequested jury instruction on a defense when "credible evidence" is proffered. *Id.* at 203–04, 307 P.3d at 1149–50. In *Taylor*, we concluded that the omission of a mistake of fact jury instruction did not constitute plain error because neither the defendant nor the State produced sufficient evidence to support the defense. *Id.* at 208, 307 P.3d at 1154.

Because Mr. Adviento did not request an EMED instruction, and, in fact, actively waived such an instruction, the *Taylor* test should apply. Under this test, the trial court would only err in failing to give the EMED instruction if credible evidence was proffered at trial. As discussed above, there was no evidence to support the EMED instruction and thus the trial court did not err in failing to give the instruction under either the "any evidence" or the "credible evidence" standards.

The majority contends that the holding in *Taylor* is not applicable here because *Taylor* concerned a non-affirmative complete defense whereas this case concerns an affirmative mitigating defense. Majority at 147, 319 P.3d at 1155. However, the majority fails to adequately justify why the rules for these different types of defenses should differ. The majority notes *Taylor*'s reasoning that it may be difficult for a trial court to identify the existence of "weak, inconclusive, or unsatisfactory evidence" that would support the

non-affirmative complete defense of mistake of fact. Majority at 148, 319 P.3d at 1156 (quoting *Taylor*, 130 Hawai'i at 207 n. 12, 307 P.3d at 1153 n. 12). Under the majority's reasoning, the possible existence of an EMED defense is far more readily apparent. Yet, it is not clear that affirmative mitigating defenses are always more easily identified than non-affirmative complete defenses, and the majority does not make this contention. Even if the trial court is alert to the possibility of an affirmative mitigating defense such as EMED, it may be difficult for the court to differentiate between the existence of no evidence to support the defense, and the existence of only weak, inconclusive, and unsatisfactory evidence to support the defense. Furthermore, there is no rational justification for requiring a circuit court to give an instruction regarding an affirmative defense supported by only weak, inconclusive, and unsatisfactory evidence because the defendant is required to prove this defense by a preponderance of the evidence.

## IV. Jury instructions on affirmative defenses are waivable by the defendant

### A. Our caselaw does not bar the waiver of affirmative defense instructions

The majority contends that because it is the trial court's duty to instruct the jury on the law and to determine whether the record contains the necessary evidence to support a defense instruction, a defendant should not be allowed to waive an instruction for which there is evidentiary support. Majority at 140, 319 P.3d at 1148. The majority also reasons that to allow a defendant to waive an EMED defense impairs the jury's truth finding abilities and promotes an "all or nothing" approach. Majority at 140–41, 319 P.3d at 1148–49. According to the majority, when the jury is prevented from receiving an instruction on a warranted defense, the jury is unable to "accurately determine the defendant's criminal liability based on the evidence that was presented to it." Majority at 142, 319 P.3d at 1150. In support of this conclusion, the majority relies upon this court's opinion in *State v. Haanio*, 94 Hawai'i 405, 16 P.3d 246 (2001), *overruled in part on other grounds*, *State v. Flores*, 131 Hawai'i 43, 314

P.3d 120 (2013). Majority at 140–42, 319 P.3d at 1148–50.

In *Haanio*, we held that a trial court must instruct a jury of any <u>lesser included offense</u> for which there is a rational basis in the evidence, regardless of whether the defendant objects to such instructions. *Id.* at 407, 16 P.3d at 248. We reasoned that a defendant should not be permitted to waive an included offense instruction for "strategic reasons." *Id.* at 414, 16 P.3d at 255. We strongly disapproved of " 'a strategy that permits parties in a criminal trial to forego instructions on provable lesser-included offenses, thereby forcing the jury to choose between conviction and acquittal on the greater charge.' " *Id.* (quoting C. Carpenter, *The All–or–Nothing Doctrine in Criminal Cases: Independent Trial Strategy or Gamesmanship Gone Awry?*, 26 Am. J. Crim. L. 257, 258 (1999)). We also reasoned that neither a defendant nor the prosecution have constitutional or substantial rights not to have the jury instructed on lesser included offenses. *Id.* at 414–15, 16 P.3d at 256–57.

Our opinion in *Haanio* cited to the California Supreme Court's decision in *People v. Barton*, 12 Cal.4th 186, 47 Cal.Rptr.2d 569, 906 P.2d 531 (1995), concluding that a defendant could not waive a jury instruction on lesser included offenses supported by the evidence. *Haanio*, 94 Hawai'i at 415, 16 P.3d at 256; *Barton*, 47 Cal.Rptr.2d 569, 906 P.2d at 536–37. However, in *Barton*, the California court stressed the distinction "between a trial court's relatively broad duty to instruct on lesser included offenses and its less expansive duty to instruct on defenses." 47 Cal.Rptr.2d 569, 906 P.2d at 536–37. The California court reasoned that limiting a trial court's duty to issue defense instructions in no way limits the jury's ability to fully consider all criminal offenses supported by the evidence:

> When . . . the question is whether the trial court must, on its own initiative, instruct the jury on *defenses* not asserted by the defendant, different considerations arise. Failure to so instruct will not deprive the jury of the opportunity to consider the full range of criminal offenses established by the evidence. Nor is the prosecution de-

nied the opportunity to seek conviction on all offenses included within the crime charged. Moreover, to require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant. "Appellate insistence upon *sua sponte* instructions which are inconsistent with defense trial theory or not clearly demanded by the evidence would hamper defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions."

*Id.*, 47 Cal.Rptr.2d 569, 906 P.2d at 536 (quoting *People v. Sedeno*, 10 Cal.3d 703, 112 Cal.Rptr. 1, 518 P.2d 913, 921–22 (1974), *overruled on other grounds by People v. Breverman*, 19 Cal.4th 142, 77 Cal.Rptr.2d 870, 960 P.2d 1094 (1998)). The California court concluded that the trial court only has a duty to give a *sua sponte* jury instruction "if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." *Id.*, 47 Cal. Rptr.2d 569, 906 P.2d at 534.

While the California courts recognize that, "even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence," they have repeatedly concluded that this duty does not extend to instructing a jury on defenses that are inconsistent with a defendant's theory of the case. *Sedeno*, 112 Cal.Rptr. 1, 518 P.2d at 921; *see also Breverman*, 77 Cal.Rptr.2d 870, 960 P.2d at 1102 (emphasizing the "sharp distinction" between instructions on defenses and those on lesser included offenses); *Barton*, 47 Cal. Rptr.2d 569, 906 P.2d at 536–37 (reasoning that there are strong policy considerations to support the distinction between defense instructions and lesser included offense instructions); *People v. Elize*, 71 Cal.App.4th 605, 84 Cal.Rptr.2d 35, 39–40 (1999) (stating that courts have a duty to instruct on lesser included offenses *sua sponte*, but that courts

only have a duty to instruct on defenses as requested by the defendant). The California courts acknowledge that a defendant may not waive an instruction on a lesser included offense because "a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." *Sedeno*, 112 Cal.Rptr. 1, 518 P.2d at 921. However, the California courts also observe that to mandate a court to *sua sponte* instruct on every defense supported by substantial evidence places an undue burden upon trial judges and is possibly prejudicial to defendants. *Id.* Therefore, when "there is substantial evidence of a defense inconsistent with the defense advanced by defendant, the court should ascertain whether the defendant wants instructions on the alternate theory" and should give the instruction when it is expressly requested by the defendant. *Elize*, 84 Cal.Rptr.2d at 42.

**B. Defendants have a constitutional right to control their defenses**

In crafting rules regarding the *sua sponte* issuance of jury instructions, we must not only be cognizant of the trial court's duty to instruct the jury properly on the law, but also of a defendant's right to present the defenses of his or her choosing. *Compare Haanio*, 94 Hawai'i at 414–15, 16 P.3d at 255–56 (stating that it is the duty of the trial courts to ensure that juries are properly instructed) *and State v. Kupau*, 10 Haw.App. 503, 516, 879 P.2d 559, 565 (1994) (discussing a defendant's right to dictate a defense strategy). The defendant's right to control his or her defense emanates from the sixth amendment to the United States Constitution [1] and article I, section 14 of the Hawai'i Constitution [2]. The United States Supreme Court has explained that the sixth amendment provides both the right to the effective assistance of counsel and also the right to control one's defense. *See Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("The Sixth Amendment

recognizes the right to the assistance of counsel.... Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense."). Previous United States Supreme Court cases have held that the right to present a defense free from government interference was violated by a Tennessee rule that required the defendant to be the first defense witness, *Brooks v. Tennessee*, 406 U.S. 605, 612–613, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), and by a Georgia statute barring direct examination of the defendant, *Ferguson v. Georgia*, 365 U.S. 570, 593–96, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961). The Court in *Brooks* explained, "Whether the defendant is to testify is an important tactical decision ... [and] the statute restricts the defense—particularly counsel—in the planning of its case." 406 U.S. at 612–13, 92 S.Ct. 1891.

Hawai'i courts have also recognized that "[t]he sixth amendment and article I, section 14 of the Hawai'i Constitution guarantee an accused the right to the assistance of counsel in his or her defense, ... as well as the right to present a defense." *State v. Vliet*, 91 Hawai'i 288, 294 n. 3, 983 P.2d 189, 195 n. 3 (1999) (internal citations omitted). We have explained that this right to offer a defense extends to the right to control that defense:

Undeniably, the defendant has a constitutional right under the sixth amendment to offer a defense, and, as an adjunct to this right, to devise a proper and appropriate trial strategy to blunt or otherwise neutralize the thrust of the prosecution's case-in-chief. But this right and option, while relevant to the jury's duty to properly perform its constitutional functions in arriving at a just decision, is separate and distinct from the independent duty of the court to reasonably assist and instruct the jury in the intelligent discharge of these

---

1. The sixth amendment to the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ... and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

2. Article I, section 14 of the Hawai'i Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury ... and to have the assistance of counsel for the accused's defense." Haw. Const. art. I, § 14.

functions so as to avoid a miscarriage of justice.

*Kupau,* 10 Haw.App. at 516–17, 879 P.2d at 565 (emphasis added) (quoting Edward G. Mascolo, *Procedural Due Process and the Lesser–Included Offense Doctrine,* 50 Alb. L.Rev. 263, 299–300 (1986)). Furthermore, "under the Hawaii's [sic] Constitution, defendants are clearly afforded greater protection of their right to effective assistance of counsel," which extends to their right to dictate trial strategy. *State v. Aplaca,* 74 Haw. 54, 67 n. 2, 837 P.2d 1298, 1305 n. 2 (1992).

A defendant's choice of defenses is a crucial element of trial strategy. Just as the government may not dictate the order of defense witnesses or interfere with the direct examination of the defendant, the government must also refrain from forcing a defense instruction upon a defendant. For the court to issue a defense instruction actively opposed by the defendant is a governmental intrusion into the defendant's trial strategy. This intrusion deprives a defendant of his or her control over the defense and deprives the defendant of the value of his or her attorney's strategic advice regarding the choice of defenses.

Generally, a defendant or "[d]efense counsel's tactical decision at trial will not be questioned by a reviewing court." *State v. Samuel,* 74 Haw. 141, 156, 838 P.2d 1374, 1382 (1992). As I emphasized in my dissent in Stenger, "it is not the trial court's responsibility to implement defense strategy with a defense instruction when the defense counsel fails to do so." *Stenger,* 122 Hawai'i at 305, 226 P.3d at 475 (Nakayama, J., dissenting) (emphasis in original). Furthermore, the trial court should not actively undermine a defense strategy by issuing a defense instruction contrary to a defendant's theory of the case. When a trial court issues a defense instruction over a defendant's waiver of that instruction, the trial court is reaching beyond its established role as the instructor of law and interfering with a defendant's sixth amendment and article I, section 14 right to control his or her defense.

While we have concluded that the trial court's duty to instruct on lesser included offenses outweighs any interest the defendant might have in waiving such an instruction, the balancing of these interests is fundamentally different for jury instructions regarding defenses. *See State v. Auld,* 114 Hawai'i 135, 149, 157 P.3d 574, 588 (App. 2007) (Nakamura, J., concurring and dissenting) ("[T]he question of whether the defendant should have a say in how to defend against the charges presented to the jury by forgoing a self-defense instruction is different from the question … of whether the defendant can prevent the jury from considering his or her guilt on lesser included offenses.") Trial courts are mandated by statute to instruct the jury as to any lesser included offense for which "there is a rational basis in the evidence." HRS § 701–109(5) (1993) ("The court is not obligated to charge the jury with respect to an included offense <u>unless</u> there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." (emphasis added)); *see also Haanio,* 94 Hawai'i at 414, 16 P.3d at 255 ("We now conclude that the better rule is that trial courts must instruct juries on all lesser included offenses as specified by HRS § 701–109(5), despite any objection by the defense, and even in the absence of a request from the prosecution.").

There is no analogous statutory mandate for defense instructions. The jury may only receive an instruction on a defense if "evidence of the specified fact or facts has been presented." HRS § 701–115(2). In the case of affirmative defenses such as EMED, the defendant may only be acquitted if the jury concludes that the defense was proven by a preponderance of the evidence. It would seem particularly strange for a court to foist an affirmative defense upon a defendant, forcing a defendant to bear the burden of proving that defense by a preponderance of the evidence, where the defendant altogether opposes instructing the jury on such a defense.

## C. The *Taylor* test should be modified to permit waiver

To provide clear rules for trial courts while protecting the rights of defendants, we

should incorporate aspects of California's test for the issuance of *sua sponte* jury instructions into the *Taylor* "credible evidence" standard. The California Supreme Court has elaborated upon a similar standard: "[T]he duty to give instructions, Sua sponte [sic], on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." *Sedeno*, [112 Cal.Rptr. 1,] 518 P.2d at 921. "[W]hen the trial court believes 'there is substantial evidence that would support a defense inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory.'" *Breverman*, [77 Cal.Rptr.2d 870,] 960 P.2d at 1102 (emphasis omitted) (quoting *Sedeno*, [112 Cal.Rptr. 1,] 518 P.2d at 922 n. 7).

I recommend that we clarify the *Taylor* test to allow a defendant to enter a knowing, intelligent, and voluntary waiver of a defense jury instruction. Under this test, a trial court only has a duty to give unrequested instructions on defenses if the defense is supported by credible evidence and the defendant does not waive such an instruction. When the prosecution or the trial court identifies a defense supported by credible evidence, the trial court should seek the defendant's approval before instructing the jury on such a defense. This process will prevent a defendant from being unduly prejudiced by defense instructions inconsistent with the defendant's theory of the case.

#### D. The majority's fears are unfounded

The majority fears that permitting waiver of defense instructions will undoubtedly lead to the defendant challenging the waiver on appeal. Majority at 143 n. 21, 319 P.3d at 1151 n. 21. The majority's concern appears unfounded. Where a defendant has entered an on the record waiver of a defense instruction, the defendant may not allege on appeal that the court plainly erred in not issuing the defense instruction.[3] Indeed, it appears that it is the majority's test that will lead to a greater number of appellate challenges. Under the majority's test, defendants may prevail on appeal by arguing that the circuit court plainly erred in failing to give a defense instruction that the defendant did not request at trial and that was supported by only a scintilla of evidence.[4]

The concerns we raised in *Haanio* regarding the waiver of lesser included offense instructions are also not implicated by the waiver of defense instructions. Allowing a defendant to waive a lesser included offense instruction "forecloses the determination of criminal liability where it may in fact exist." *Haanio*, 94 Hawai'i at 414, 16 P.3d at 255. However, allowing defendants to choose which <u>defenses</u> to raise, and which to waive, does not constrain the trial court from instructing the jury on the full range of <u>offenses</u> for which defendants may be liable. It simply allows defendants, assisted by their counsel, to exercise their sixth amendment right to control their defenses.

The majority also references the concern we expressed in *Haanio*, regarding the trial court's role in determining whether to give an included offense instruction where the State and the defendant express divergent interests. 94 Hawai'i at 413–14, 16 P.3d at 254–55. We stated, "[P]ermitting the parties, for their strategic reasons, to cast upon the trial court the burden, at the risk of error, of deciding not to give an included instruction when the evidence supports it, may have unduly complicated the trial court's

---

3. Defendants may of course raise ineffective assistance of counsel claims if they allege that the waiver was based on constitutionally defective advice from their attorneys. Additionally, defendants may challenge whether the waiver of the defense instruction was knowing, voluntary, or intelligent. However, these possible points of error would not raise any obstacles on appeal not present in other challenges to the effectiveness of counsel or the validity of a waiver.

4. This result is particularly illogical because a jury may only convict a defendant of EMED manslaughter if it concludes that the preponderance of the evidence proves that the defendant was acting under the influence of reasonably induced extreme mental or emotional disturbance at the time of the offense. *See* HRS § 701–115(2)(b) (1993)

ultimate obligation to promote justice in criminal cases." *Id.* at 414, 16 P.3d at 255. The majority reasons that this same concern would be implicated were waiver of defense instructions permitted. Majority at 44–45. However, in the case of defense instructions, the trial court will not "be required to 'steer[ ] through the competing interests' of the parties and determine, at the risk of error, whether or not to give the instruction." Majority at 143, 319 P.3d at 1151 (alteration in original) (quoting *Haanio*, 94 Hawai'i at 414, 16 P.3d at 255). The State may alert the court to a defense it believes to be supported by the evidence or it may argue that there is no evidence to support a particular defense instruction. However, the State has no legitimate interest in requesting that the circuit court not give a defense instruction when that instruction is requested by the defendant and supported by credible evidence. The presentation of a particular defense is a tactical decision constitutionally reserved for the defendant. If the defendant wishes to waive an instruction, this decision must be honored by the trial court.[5]

The majority also posits that permitting a defendant to waive the consideration of a defense supported by some evidence would place the trial court in an untenable situation in the case of bench trials. Majority at 144–45, 319 P.3d at 1152–53. The majority contends that where a defendant in a bench trial has waived a defense, "the trial judge would be forced to reach an 'untrue' verdict not based on the facts but instead dictated by the defendant's trial strategy." Majority at 144, 319 P.3d at 1152. However, this fear ignores the fact that judges are often privy to factual and legal information that they are barred from considering when adjudicating a bench trial. In a bench trial, judges routinely receive incompetent evidence or evidence that is admissible for a only a limited purpose. "[W]hen evidence is admissible for a limited purpose, we presume that the judge only

considered the evidence for the permissible purpose." *State v. Lioen,* 106 Hawai'i 123, 133, 102 P.3d 367, 377 (App.2004); *see also State v. Vliet,* 91 Hawai'i 288, 298, 983 P.2d 189, 199 (1999) (" '[A] judge is presumed not to be influenced by incompetent evidence.' " (quoting *State v. Antone,* 62 Haw. 346, 353, 615 P.2d 101, 107 (1980))). A judge may also have knowledge of statutory violations, other than those with which the defendant was charged, which are proved by the evidence presented during the bench trial. However, the judge is of course barred by due process considerations from convicting the defendant of these uncharged offenses. Judges' verdicts in these situations are no less "true" simply because the judges are barred from considering facts and law outside the scope of the matter before the court.

Judges must maintain neutrality and " 'should not assume the role of advocate for either party.' " *State v. Medeiros,* 80 Hawai'i 251, 261, 909 P.2d 579, 589 (App.1995) (quoting *State v. Silva,* 78 Hawai'i 115, 118, 890 P.2d 702, 705 (App.1995)). In bench trials, this admonishment is of particular importance because, " 'the court acts both as the judge of the law and as the judge of the facts.' " *Id.* (quoting *Silva,* 78 Hawai'i at 118, 890 P.2d at 705). " 'When the trial judge fails to act impartially and takes on the role of the prosecutor, the resulting conviction will be reversed.' " *Id.* (quoting *Silva,* 78 Hawai'i at 118, 890 P.2d at 705). It is equally important that the judge not take on the role of defense attorney. But, pursuant to the majority's opinion, a judge must now assert a defense on behalf of a defendant when the defendant has specifically waived that defense.[6]

### V. Mr. Adviento validly waived the EMED instruction

As discussed in Part I, there was no evidence to support an EMED instruction.

---

5. The majority contends that the State's interest in obtaining a "true verdict" supports giving "the jury the opportunity to convict the defendant of manslaughter." Majority at 143, 319 P.3d at 1151. However, if the State believed the evidence supported a conviction of manslaughter it was not precluded from arguing as much to the jury. The jury received an instruction regarding

the lesser included offense of reckless manslaughter and could have convicted Mr. Adviento of this offense.

6. Of course, there is nothing to prevent a judge from convicting a defendant of a lesser included offense such as manslaughter if it is supported by the evidence.

However, even if sufficient evidence was presented to support an EMED instruction, Mr. Adviento entered a knowing, intelligent, and voluntary waiver of the instruction. In determining " 'whether a waiver was voluntarily and intelligently undertaken, this court will look to the totality of facts and circumstances of each particular case.' " *State v. Friedman,* 93 Hawai'i 63, 68–69, 996 P.2d 268, 273–74 (2000). The majority suggests that even if defendants are permitted to waive defense instructions, Mr. Adviento's purported waiver of the EMED instruction was not knowing, intelligent, and voluntary. Majority at 143–44, 319 P.3d at 1151–52. The majority contends that Mr. Adviento was motivated to waive the EMED instruction by his belief that such a waiver would prevent the State from admitting his prior assault conviction into evidence. Majority at 143–44, 319 P.3d at 1151–52. However, a review of the circuit court's multiple colloquies with Mr. Adviento demonstrates that the admission of Mr. Adviento's prior conviction into evidence was not directly tied to Mr. Adviento's assertion of the EMED defense, and Mr. Adviento's waiver of the defense instruction was knowing, intelligent, and voluntary.

## A. Mr. Adviento entered a knowing, intelligent, and voluntary waiver of the EMED instruction

In a pretrial hearing, Mr. Adviento and the State first discussed the admissibility of his prior assault conviction resulting from an altercation with Mrs. Adviento. The trial court stated that it would not rule upon the admissibility of the conviction at that time because it was potentially prejudicial and its probative value was as of yet undefined. The trial court reasoned that if Mr. Adviento raised an EMED defense based upon the nature of his relationship with Mrs. Adviento, the evidence of the prior conviction could be used in rebuttal to demonstrate that their marital problems were longstanding. However, the trial court did not foreclose the possibility of admitting the prior conviction into evidence if Mr. Adviento was to forego the EMED defense.

Prior to trial, Mr. Adviento's attorney stated on the record that Mr. Adviento had decided not to assert the EMED defense. The State responded that if Mr. Adviento raised the EMED defense, the State would move to admit evidence of Mr. Adviento's prior assault conviction. The trial court responded: "If EMED is not raised, it's unlikely that the Court's going to allow that." The court then stated that it would not decide the issue at that time and that it would conduct a full voir dire after opening statements.

At the conclusion of Mr. Adviento's case, the trial court questioned Mr. Adviento regarding the EMED defense. The trial court established that Mr. Adviento understood that EMED is an affirmative defense that reduces the crime of murder to manslaughter and that if the jury was not instructed on EMED, the jury would not have the option of convicting Mr. Adviento of manslaughter. Mr. Adviento stated that he had discussed the defense of EMED with his attorney and that he had decided to give up his right to assert the defense. At the urging of the State, the trial court asked Mr. Adviento if he would like to discuss his waiver with his attorney again and stressed that Mr. Adviento was free to change his mind. Mr. Adviento responded that he would like to speak to his attorney and the court took a brief recess.

When Mr. Adviento returned, his attorney stated that he had discussed the EMED defense "quite extensively" with Mr. Adviento previously and that Mr. Adviento had simply had "a few clarification questions." In response to questions from the trial court, Mr. Adviento said that he had received sufficient time to discuss the waiver with his attorney and that he did not have any further questions. Mr. Adviento then stated that he would "go for the self-defense" and that he would not raise the defense of EMED. The trial court then found that "the Defendant having been fully informed has knowingly, intelligently, and voluntarily waived any jury instruction on extreme mental or emotional disturbance."

Mr. Adviento's waiver of the EMED defense appears to have been a decision that he entered into after extensive discussions

with his attorney. In waiving the EMED defense instruction, Mr. Adviento specifically stated his desire to rely instead upon the complete defense of self-defense. The trial court explicitly informed Mr. Adviento of the consequences of his waiver and Mr. Adviento stated that he did not have any questions regarding the instruction. The record demonstrates that his waiver was knowing, intelligent, and voluntary.

### B. Evidence of Mr. Adviento's prior conviction would have been admissible had the court instructed the jury on the EMED defense

Mr. Adviento's waiver of the EMED instruction is in no way invalidated by the connection between the EMED defense and the admission of evidence of Mr. Adviento's prior assault conviction. Had the court issued an EMED instruction, the evidence of Mr. Adviento's prior conviction would have been admissible pursuant to Hawai'i Rules of Evidence (HRE) Rule 404(b) (2008). Thus, although the trial court had yet to rule on this issue, Mr. Adviento's waiver of the EMED instruction may have been partially motivated by his desire to prevent his prior conviction from coming into evidence. The majority would disrupt Mr. Adviento's strategic decision and force him to receive the unwanted jury instruction and the resultant entry of his prior conviction into evidence.

Evidence of prior bad acts " 'is admissible when it is 1) relevant and 2) more probative than prejudicial.' " *State v. Cordeiro*, 99 Hawai'i 390, 404, 56 P.3d 692, 706 (2002) (some internal quotation marks omitted) (quoting *State v. Torres*, 85 Hawai'i 417, 421, 945 P.2d 849, 853 (App.1997)). HRE Rule 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

" 'The list of permissible purposes in Rule 404(b) is not intended to be exhaustive for the range of relevancy outside the ban is almost indefinite.' " *State v. Behrendt*, 124 Hawai'i 90, 103, 237 P.3d 1156, 1169 (2010) (some internal quotation marks omitted) (quoting *State v. Clark*, 83 Hawai'i 289, 300–01, 926 P.2d 194, 205–06 (1996)). Here, evidence of Mr. Adviento's prior conviction for assaulting Mrs. Adviento would have been admissible to rebut an EMED defense based on the Advientos' relationship.

In *State v. Maelega*, 80 Hawai'i 172, 907 P.2d 758 (1995), we held that the trial court did not err in introducing prior bad act evidence to rebut an EMED defense. 80 Hawai'i at 184, 907 P.2d at 770. The defendant Maelega was charged with murdering his wife by choking her with his hands, strangling her with an electric cord, slashing her throat, and stabbing her in the back and breasts. *Id.* at 175, 907 P.2d at 761. At trial, Maelega argued that he was acting under an extreme emotional disturbance caused by the state of their marriage. *Id.* The trial court concluded that evidence of Maelega's prior acts of abuse was admissible to "rebut[ ] both prongs of the extreme mental or emotional disturbance defense in that it may tend to show that [Maelega] acted with self-control at the time that he allegedly killed his wife, and secondly, it may tend to show that even if [Maelega] did not act with self-control, then there was no 'reasonable explanation' for his extreme mental or emotional disturbance." *Id.* at 184, 907 P.2d at 770 (first alteration added). We reasoned that the evidence was admissible despite the fact there was "little similarity between [Maelega's] prior acts and the instant offense as alleged in that the prior acts do not involve weapons, and do not involve strangulation or stabbing." *Id.* at 183, 907 P.2d at 769 (alteration in original).

In *State v. Haili*, 103 Hawai'i 89, 79 P.3d 1263 (2003), we again held that prior bad acts could properly be admitted into evidence to rebut an EMED defense. *Id.* at 106, 79 P.3d at 1280. We commented that where a defendant alleged that he was under the influence of EMED when he killed his wife, evidence of his prior threats to kill his wife "may have

been sufficient for the jury to conclude that [the Defendant] was not under the influence of EMED." *Id.*

The majority states that an EMED instruction was required because there was evidence that "[Mr.] Adviento may have been under significant strain and stress at the time he caused [Mrs. Adviento]'s death, particularly due to the problems he and [Mrs. Adviento] were experiencing." Majority at 151, 319 P.3d at 1159. As in *Maelega* and *Haili,* the evidence of Mr. Adviento's prior violent acts would be highly probative in rebutting such an EMED defense. The evidence of Mr. Adviento's previous conviction for assault resulting from an altercation with Mrs. Adviento may tend to show that he acted with self-control when he killed Mrs. Adviento and that there was not a "reasonable explanation" for his very violent reaction to the preexisting strain in their relationship. Although the prior conviction is also prejudicial, the evidence appears to be more probative than prejudicial and the circuit court could have admitted it to rebut an EMED defense.

## VI. Conclusion

While it is the duty of trial courts to instruct juries upon the law, this duty must not be extended so far as to mandate that trial courts control a defendant's choice of defenses. The majority would require trial courts to issue defense instructions even where, as here, the defendant has entered a knowing, intelligent, and voluntary waiver of the instruction for strategic reasons. Furthermore, the majority's adoption of the "any evidence" standard for unrequested defense instructions is unsupported by our recent precedent and overly burdensome upon the trial courts. The majority's opinion requires the trial courts to intrude upon defendants' exclusive purview in presenting their defenses, to be constantly alert to the possibility that "any evidence" has been raised to support an unrequested defense instruction, and to give this instruction, even over the objections of defendants. The majority's rule places an impracticable burden upon the trial courts and is potentially highly prejudicial to defendants.